187 So.2d 695 (1966)
UNITED CONTRACTORS, INC., and Acme General Contractors, Inc., Florida Corporations, Appellants,
v.
UNITED CONSTRUCTION CORPORATION, a Florida Corporation, and Industrial Credit Company, a Minnesota Corporation, Appellees.
No. 5605.
District Court of Appeal of Florida. Second District.
June 10, 1966.
*697 Charles E. Davis, of Fishback, Davis, Dominick & Troutman, Orlando, for appellants.
Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellees.
PIERCE, Judge.
United Construction Corporation will be herein referred to as Construction; United Contractors, Inc., as Contractors; Acme General Contractors, Inc., as Acme; and Industrial Credit Company as Industrial. The first three are Florida corporations, and Industrial is a Minnesota corporation.
On December 30th, 1963, Construction filed its complaint in the Polk County Circuit Court against Contractors, seeking a declaratory decree adjudicating the rights of the parties arising out of disputes between them concerning the sale or transfer of certain heavy road building equipment by Construction to Contractors. On March 10, 1964, Construction filed amended complaint, adding Acme as additional defendant, and alleging further facts occurring after the suit was filed. Motions to dismiss and to strike were filed by Contractors and motion to dismiss by Acme, which motions were all later denied by the Court. Later Contractors and Acme filed joint answer to Construction's amended complaint.
Up to this point the case had been replete with acrimonious charges, countercharges, recriminations, accusations of fraud, deception and sharp dealing, back and forth between the parties, none of which have presently anything to do with the subject matter of this appeal, except as it concerns only one of the many items of road building equipment involved, namely, a Northwest 95 Dragline, hereinafter dealt with, more particularly described as follows:
"One NW #95 dragline, Serial No. 12737 with Murphy diesel engine, Model Me-6, Serial No. 13453, 75 foot boom, 2 1/2 yard Hendrix bucket."
On April 8, 1964, Industrial, as intervenor, filed its Complaint against the other three parties to the suit, alleging that in October, 1963, Construction had purchased certain road building equipment from Hydraulic Machinery, Inc., by retail installment contract, which contract was immediately assigned to Industrial, and during the same month had purchased by similar contract direct from Industrial certain additional road building equipment, neither of which contracts covered the NW #95 dragline aforesaid but covered certain described equipment entirely different and apart from *698 said dragline; that in July, 1963, Construction purchased the NW #95 dragline in question from Reynolds and Smith, Inc. by similar contract, which was immediately assigned by Reynolds and Smith to Industrial. That on December 31, 1963, Industrial, being the owner of all three aforesaid contracts, agreed with Construction to "consolidate" the indebtednesses into one obligation, and in pursuance thereof Construction executed to Industrial a new promissory note in the total sum of $32,394.78 payable monthly over a period of eighteen months, and also a chattel mortgage covering all of the equipment described in the three contracts, as security for payment of the note. The NW #95 dragline aforesaid was only one of many items of road building equipment described and covered by the three contracts, and as stated was involved in only one of them, the original Reynolds and Smith contract. The obligations of Construction on all three contracts amounted in the aggregate to $29,449.80, to which was added $2,944.98 finance charges for the eighteen months period, making the total of $32,394.78 fixed in the note. Construction paid only $508.21 on the first monthly payment of $1,800.00 due on February 15, 1964,[1] and had paid nothing thereafter, causing the accelerated balance due thereon to amount to $31,886.57, which was the amount demanded in the "foreclosure" complaint of Industrial as intervenor. Attorney's fees and ancillary relief to the foreclosure was prayed. Industrial's Complaint did single out the NW #95 dragline as being an item of equipment as to which Contractors and Acme "claims or may claim an interest," but it was alleged that the interest of Industrial was superior to that of Contractors or Acme.
Decree Pro Confesso was entered in favor of Industrial against Construction because of the latter's failure to answer the intervention complaint, but Contractors and Acme filed joint answer, denying the allegations thereof and alleging, as to the NW #95 dragline, that the "bona fide purchasers of the said dragline (Contractors) were without knowledge of intervenor's claims thereto." Thereafter, voluminous evidence was adduced before the Chancellor upon the issues so joined.
On July 31, 1964, the Chancellor entered Final Decree, denying Construction the relief prayed for in its complaint as amended, and denying Contractors and Acme any relief on their counterclaims. As to Industrial, the decree found the sum of $31,886.57 due on its note and mortgage and that Industrial was entitled to recover that amount from Construction, together with an attorney's fee of $2,500.00 for foreclosing the mortgage. The decree found and adjudicated the equities in the cause to be with Industrial and against Construction, Contractors and Acme "for a lien in the sum of $34,386.57" constituting the amount due under the note and mortgage together with the attorney's fee "and such other costs as may be expended or incurred" in the further foreclosure proceedings. The decree divided the equipment covered by the "consolidated" mortgage into parcels 1 and 2, parcel 1 consisting only of the NW #95 dragline, and parcel 2 consisting of all the remaining 11 items of road building equipment. It was ordered that unless such total amounts were forthwith paid to Industrial, the property would be sold at foreclosure sale, parcel 2 to be sold first in bulk, and in the event such parceled property did not bring the total amount due, then parcel 1 consisting of the NW #95 dragline was to be sold. Jurisdiction was reserved "for the purpose of entering a deficiency decree if such may be appropriate after sale."
*699 Contractors and Acme filed their joint Notice of Appeal to this Court and have assigned as error only that portion of the Final Decree concerning and affecting the NW #95 dragline. In their Brief the appealing defendants say "[t]his appeal involves only the trial Court's determination that the lien of the intervenor in its entirety was applicable to the said NW dragline."
To determine the correctness of including the dragline in the omnibus note and mortgage foreclosure, as against the rights of Contractors and Acme, it is necessary to trace the history of said dragline and delineate the dealings between the various parties to the suit with respect to the dragline, from the time it came into the possession of any of them down to the entry of the decree. This can best be done by documenting an undisputed seqence of events in chronological order, as follows:
(1) On October 1, 1962 Construction acquired possession of the described dragline under a written lease-purchase contract whereby Construction leased the equipment from Reynolds and Smith' agreeing to furnish all necessary repairs and maintenance thereon, with option of purchase at any time during the life of the lease at a price of $20,000.00 upon terms of $1,250.00 equal monthly payments, plus interest.
(2) On July 20, 1963, Construction executed a lease-purchase contract in favor of Contractors, whereby the dragline in question, together with numerous other items of road building equipment, were transferred to Contractors at specified prices and terms as to each separate item, the purchase price of this particular dragline being fixed at $30,000.00 with a monthly rental of $1,500.00. Proper maintenance and repair by Contractors was provided for, and option was given to Contractors to purchase the dragline in question or any other of the units specified in the contract at the purchase prices indicated, with 95% of the rentals paid to be credited on the purchase price. Said contract contained the following provision: "It is understood and agreed that there is presently an indebtedness due and owing by Lessor (Construction) to Reynolds and Smith * * *," which indebtedness Construction agreed to keep current, but Contractors reserved tile right to make any payments owing on the equipment in the event Construction failed to do so.
(3) On July 30, 1963, Reynolds and Smith executed a more formalized and detailed Retail Installment Contract to Construction covering the dragline in question, for the same purchase price of $20,000.00 as in their previous agreement of October 1, 1962, but with an acknowledged down payment of $8,085.00 and monthly payments on the time balance reduced to $723.00 per month for 18 months.
(4) On August 7, 1963, Reynolds and Smith assigned its interest in the last mentioned Retail Installment Contract to Industrial, for which assignment Industrial paid Reynolds and Smith the sum of $11,915.00 constituting the "unpaid balance" then due upon the dragline.
(5) On October 3, 1963, Construction executed Bill of Sale to Contractors covering said dragline in question, together with the other equipment specified and described in the lease-purchase contract between said parties of July 20, 1963. Said Bill of Sale expressly provided: "Subject to all outstanding mortgages." This Bill of Sale was recorded on October 7, 1963 in Official Record Book 749, at page 363, of the Public Records of Polk County, Florida.
(6) Contractors was in possession of the dragline since the original lease-purchase agreement with Construction of July 20, 1963, and made payments each *700 month through and including December, 1963, to Industrial at the rate of $723.00 per month as provided in the Retail Installment Contract of purchase between Reynolds and Smith and Construction dated July 30, 1963, and assigned to Industrial, which monthly payments Industrial accepted from Contractors.
(7) On December 31, 1963, Construction being in default in payment of its obligations under two other Retail Installment Contracts covering purchases of described equipment separate and apart from the dragline in question, which contracts Industrial then held and owned the first was a contract of October 15, 1963, with Hydraulic Machinery and thereupon assigned to Industrial, and the other was a contract of October 19, 1963, with Industrial direct), executed in favor of Industrial a new "consolidated" promissory note for $32,394.78 payable in monthly installments of $1,800.00 per month for 18 months, and also executed a chattel mortgage in favor of Industrial to secure payment of said note, said mortgage covering all of the equipment specified and described in the two said defaulted contracts of October 15, 1963, and October 19, 1963, and also the NW #95 dragline in question, upon which Contractors was making monthly payments to Industrial under the original purchase contract, including the current December payment. The amount of $32,394.78 specified in the note was arrived at by adding the current indebtedness owed on the NW # 5 dragline to the defaulted indebtednesses due under the other two contracts of Construction, making a total of $29,449.80, to which was added finance charges of $2,944.98, making the total of $32,394.78. No money changed hands between Construction and Industrial in connection with execution of this note and mortgage.
(8) On December 31, 1963, the date of the "consolidated" note and mortgage, the balance due on the Retail Installment Contract covering the NW # 95 dragline had been reduced by Contractors to less than $10,000.00 by virtue of the monthly payments it was making to Industrial.
(9) Contractors was, and had been since July 20, 1963, in open and notorious possession of the dragline on December 31, 1963, when the new note and chattel mortgage were executed, which mortgage was not recorded until almost a month later.
The foregoing presents the factual picture with reference to the NW #95 dragline, the sole subject matter of this appeal. Practically all of it is documentary and undisputed. It was not all alleged in the pleadings but was developed in detail by the evidence. Only a relatively small portion of the entire evidence taken in the case had to do with this dragline. The original parties to the suit were engaged in a somewhat acrimonious, no-holds-barred round of adversary pleadings, taking of depositions, propounding interrogatories and making replies thereto, demanding admissions, and all the other panoply of strategic gyrations that usually accompany a complicated law suit in the hands of able and resourceful counsel preparing for final trial. It was in this setting that Industrial suddenly filed its intervenor's complaint, claiming right of foreclosure upon 13 items of road building machinery, one of which, the instant dragline in question, was by far the most valuable of all the items involved, and concerning which the original parties to the suit had been largely engaged in heavy litigation for several months before. It is small wonder that one listening to or reading the four-volume record would have difficulty seeing "the forest for the trees." Certainly we have been no exception.
The Chancellor in his Final Decree made findings as to the dispute which initiated the law suit originally, and adjudicated against all the original parties, dismissing *701 Construction's complaint as amended and also the counterclaims of defendants. The Chancellor then decreed the foreclosure of Industrial's chattel mortgage securing Construction's note of December 31, 1963 for over $32,000.00. We think the Chancellor was in error in so doing, insofar as the mortgage and the foreclosure complaint embraced the NW #95 dragline.
When the "refinancing" deal was consummated between Construction and Industrial on December 31, 1963, Contractors was then and there in open, notorious, and exclusive possession of the NW #95 dragline. To all intents and purposes, Contractors was the owner of the equipment and Industrial was the mortgagee. All parties recognized them as such. Construction had given, and the Contractors had accepted, a Bill of Sale on October 3, 1963 to the dragline and had immediately recorded it. The Bill of Sale specifically provided that it was "subject to all outstanding mortgages." And Industrial entered the litigation for the avowed purpose of "foreclosing its mortgage." So Contractors had a property right involved, and property, in a legal sense, consists in the domination which is rightfully and lawfully obtained over a material thing, with the right to its use, enjoyment and disposition. Tatum Bros. Real Estate & Investment Co. v. Watson, 1926, 92 Fla. 278, 109 So. 623.
Several principles of law immediately come into focus. Constructive notice by recordation, implied actual notice from the fact of open possession, and estoppel against Industrial for accepting monthly payments under its mortgage, all appear to have a bearing.
The "constructive notice" doctrine has been fully adopted in Florida, especially as it most commonly is applied under our recording statute. See F.S. § 695.01 F.S.A.; Sapp v. Warner, 1932, 105 Fla. 245, 141 So. 124, reaffirmed on rehearing, 143 So. 648; Tri-County Produce Distributors, Inc. v. Northeast Production Credit Association, Fla.App. 1963, 160 So.2d 46; Tolar v. Myer, Fla.App. 1957, 96 So.2d 554; Daniel v. May, Fla.App. 1962, 143 So.2d 536; Davis v. Brewer, 1939, 135 Fla. 752, 186 So. 207; Maule Industries, Inc. v. Sheffield Steel Products, Inc., Fla.App. 1958, 105 So.2d 798; Hagan v. Sabal Palms, Inc., 186 So.2d 302, opinion filed March 23, 1966, 2d D.C.A.
"Implied actual notice" is an inference of fact, and includes notice inferred from the fact that a person has means of knowledge which it was his duty to use, Rinehart v. Phelps, 1942, 150 Fla. 382, 7 So.2d 783, but such possession to be notice of claim of title, must be open, visible and exclusive, Carolina Portland Cement Co. v. Roper, 1914, 68 Fla. 299, 67 So. 115. Actual possession is notice to all the world of whatever right the holder has in the property and such possession, when open, visible and exclusive, will put upon inquiry those having or acquiring any title to or lien upon the property to ascertain the nature of the right the holder really has in the property. Blackburn v. Venice Inlet Co., Fla. 1949, 38 So.2d 43. "The principle applied in cases of alleged implied actual notice is that a person has no right to shut his eyes or ears to avoid information, and then say that he has no notice; that it will not suffice the law to remain wilfully ignorant of a thing readily ascertainable * * * when the means of knowledge is at hand." Sapp v. Warner, supra.
"Equitable estoppel" precludes a person from maintaining a position inconsistent with another position which is sought to be maintained at the same time or which was asserted at a previous time; and, as a general rule where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim or right, he cannot afterward assume a position inconsistent with such act or conduct to the prejudice of another who has acted in reliance on such *702 conduct. The doctrine requires of a party consistency of conduct, when inconsistency would work substantial injury to the other party. 31 C.J.S. Estoppel § 108, page 548, et seq.; Rosello v. Hayden, Fla. 1955, 79 So.2d 682; Fairlie v. Scott, 1924, 88 Fla. 229, 102 So. 247; Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, C.A. Fla. 1935, 75 F.2d 13. The doctrine of estoppel is a part of the common law enforced in Florida, and it should be appropriately applied when the facts in a litigated case justify it. Steen v. Scott, 1940, 144 Fla. 702, 198 So. 489. As stated in Warren v. Tampa Mortgage Investors' Co., 1933, 112 Fla. 555, 150 So. 738, text 741: "[t]he law is too well settled to admit of controversy that one may not accept the fruits of a contract and at the same time renounce, or repudiate, the burdens which that contract places upon him." Industrial could not disclaim a contract upon which it was accepting payments.
But there is another and more compelling principle of law involved here, that of contractual obligation. Contractors and Industrial stood in contractual relationship each with the other. They derived their rights from their predecessors in title, Industrial by assignment of the original Retail Installment Contract from Reynolds and Smith, the original sellers of the dragline, and Contractors by Bill of Sale from Construction, the original purchaser of the dragline.[2] And Contractors were faithfully making the monthly payments of $723.00 per month to Industrial called for in the original purchase contract, and Industrial had been accepting said monthly payments from Contractors, down through the month of December, 1963. The deal involving Contractor's dragline was lumped into the two other separate deals on which Construction had defaulted and wherein Contractors was not involved and had no interest and at a time when Contractors was not in default. And the record indicates all this was done without the knowledge or consent of Contractors.
This constitutes a complete modification of the contract insofar as Contractors was concerned, and such modification, under the conditions then existing between Contractors and Industrial, could only be accomplished by mutual assent. As stated in 17A C.J.S. Contracts § 375, page 425, et seq.: "[m]odification must be made by the contracting parties or someone duly authorized to modify, and one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification." In the case sub judice what Industrial and Construction attempted on December 31, 1963 constituted a complete impairment of Contractors' property right in the dragline, without any breach by Contractors, and this the Court cannot permit.[3]
The appeal is from the entire Final Decree, and we affirm all provisions thereof, except as it involves the NW #95 dragline in question and the rights of Contractors therein and subject to the indebtedness thereon in favor of Industrial as of December 31, 1963, as to which we reverse. The case is remanded back to the able Chancellor, with authority and directions *703 to re-establish the reciprocal rights and obligations of Contractors and Industrial to the dragline in question and the contracts which existed with respect to the purchase thereof prior to execution of the documents of that date between Construction and Industrial, and among other things to permit such amendments or recasting of the pleadings as may be necessary or expedient to accomplish such objective.
Affirmed in part and reversed in part, with directions as aforesaid.
ALLEN, C.J., concurs.
BRUTON, JAS. D., Jr., Associate Judge, dissents with opinion.
BRUTON, JAS. D., Jr., Associate Judge (dissenting).
I am compelled to dissent. I am unable to disregard the findings in the Final Decree since, to me, there is substantial evidence to sustain same. I agree with the Chancellor that the Bill of Sale dated October 3, 1963, by Construction to Contractors is void, it admittedly having been made to avoid seizure by the Federal Government under a tax lien and if void, as the Chancellor held, and I agree, then the title was still in Construction. It would serve no useful purpose to extend this dissent further, other than to say that I would affirm the Chancellor's Final Decree.
NOTES
[1] This date of February 15, 1964, seems to be the first monthly payment date in tended by the parties to the note, although the note itself rends "February 15, 1963" as to the date of the first monthly payment; however, the note was dated December 31, 1963, and Industrial's own Complaint filed in the suit mentions "the first payment due February 15, 1964."
[2] Construction was challenging validity of the Bill of Sale in the litigation before the Court, but the Final Decree put at rest any question of validity as between Construction and Contractors by finding against Construction and dismissing its complaint as amended, which preyed among other things that the Bill of Sale be cancelled.
[3] One word about Acme. Acme was not chartered until January 28, 1964, after the abortive deal between Construction and Industrial kind been consummated; but in any event the able Chancellor in his final decree held that Acme stood "in the same legal position" as Contractors, and "therefore the Court makes no distinction between the two in this decree." We approve, especially as it does not affect in any way the rights of Industrial under its chattel mortgage.