413 So.2d 62 (1982)
Maxwell and Reva DAUER, As Trustees, Appellants,
v.
James J. PICHOWSKI, Sr., Ron Martino, and Sam C. Martino, Appellees/Intervenors.
No. 81-83.
District Court of Appeal of Florida, Second District.
March 19, 1982.
Rehearing Denied April 26, 1982.
S.W. Moore of Brigham, Reynolds, Byrne, Moore, Muir & Gaylord, Sarasota, for appellants.
Anthony T. Martino of Peavyhouse, Giglio, Grant, Clark, Charlton & Opp, Tampa, for appellees/intervenors.
GRIMES, Judge.
This is an appeal from the award of a brokerage commission.
In 1954 and 1955 James Pichowski, a resident of Miami, and others purchased a large tract of property on the Hillsborough River adjacent to Fletcher Avenue. The following year, all but 114 acres of this property was sold to Ben Cosor and others. In 1971, the Cosor group resold their property, consisting of approximately 660 acres, to a group of investors including the present landowner, Dr. Maxwell Dauer. Mr. Pichowski *63 obtained a commission for his services as the broker handling the transaction for the seller. In 1975, Dr. and Mrs. Dauer acquired controlling interest in the property from their associates. On December 5, 1975, Pichowski asked brokers Ron Martino and Sam Martino of Tampa to assist him in the sale of his 114 acres. Realizing that Hillsborough County was interested in creating a regional park, Ron Martino showed the Pichowski property to Edward Radice, the county director of parks and recreation, in early 1976. Recognizing that the county might want more than 114 acres for its park, Martino and Radice also looked at the adjoining Dauer parcel.
On May 30, 1977, Mr. Pichowski telephoned Dr. Dauer asking for the exclusive right to sell his property. Dauer declined to give an exclusive listing but indicated that the property was and had been on an open listing since 1971. Pichowski said that Dauer told him, "Just find a buyer and don't worry about your 10% commission," but Dr. Dauer denied that aspect of the conversation. The only selling price for the property ever publicly quoted by Dauer was $10,000 an acre. On June 2, 1977, Pichowski wrote a letter to Dauer purporting to register Hillsborough County as a potential purchaser of all or part of the 660 acres and attached a copy of a letter dated June 1, 1977, from Sam Martino to Pichowski which referred to the Dauer property and read as follows:
Dear Mr. Pichowski:
This is to inform you that we have, this date, brought to the attention of the Hillsborough County Park Division and furnished data, maps, etc. to them, concerning their possible purchase of the above property. We quoted them $6,500.00 per acre as per your instructions, which includes a 10% commission payable to you and the undersigned on a 50/50 basis in the event said land is purchased, negotiated or acquired by `eminent domain' proceedings by the Hillsborough County Park Division.
On February 21, 1978, June 26, 1978, and July 6, 1978, Mr. Pichowski wrote Dr. Dauer advising him of the continuing efforts of the Martinos to consummate a sale of the property to Hillsborough County. On August 22, 1978, Hillsborough County purchased Pichowski's 114 acres, and the Martinos received a real estate commission for their services in bringing about the sale. On October 16, 1978, Dauer's administrative assistant wrote Pichowski advising him that he had no authority to negotiate the sale of the Dauer property and that any of his activities pertaining to that property were being done at his own risk. Thereafter, Hillsborough County land acquisition agents negotiated directly with Dauer for the purchase of a portion of his property to round out the county park. Hillsborough County offered to buy 117 acres for $4,200 per acre, but Dauer declined the offer. Hillsborough County then filed a condemnation suit to acquire the 117 acres as part of its park. Pichowski and the Martinos intervened in the action claiming their right to a 10% commission. Following a nonjury trial on the merits of the intervenors' claim, the court entered an order finding that they were entitled to a 10% real estate commission on the final value of the parcel established in the condemnation proceedings.[1]
It is well settled that a condemnation proceeding does not constitute a sale for purposes of the right to be paid a real estate commission. Preston v. Carnation Co., 196 Cal. App.2d 43, 16 Cal. Rptr. 240 (1961); Haigler v. Ingle, 119 Colo. 145, 200 P.2d 913 (1948); Wilson v. Frederick R. Ross Investment Co., 116 Colo. 249, 180 P.2d 226 (1947); Schwenn v. S. Goldberg & Co., 88 N.J. Super. 113, 210 A.2d 808 (1965), aff'd 91 N.J. Super. 346, 220 A.2d 421 (1966); Shaw v. Avenue D Stores, Inc., 115 N.Y.S.2d 194 (Sup.Ct. 1952); Emerson C. Custis & Co. v. Tradesman's National Bank & Trust Co., 155 Pa.Super. 282, 38 A.2d 409 (1944). Even where he is the procuring cause of property being acquired by condemnation, a broker can only recover a commission if there is a specific provision in *64 the brokerage contract to this effect. Wilson v. Frederick R. Ross Investment Co.; Shaw v. Avenue D Stores, Inc. The recurring theme of these cases is that the property owner should not be required to pay a real estate commission under the normal brokerage contract when his property is condemned because in such circumstances he is not a willing seller. In Wilson the court concluded that a transaction may be considered a sale for purposes of a broker's commission only when the owner agrees on the property to be sold, concurs as to the time at which he is to give up possession, and has the power to negotiate a satisfactory price. Obviously, condemnation meets none of these tests.
The only Florida decision to discuss the issue is Keyes Co. v. Florida Nursing Corp., 340 So.2d 1254 (Fla. 3d DCA 1976). In that case, Dade County sought the assistance of a broker in finding property to be used as a rehabilitative center for chronic alcoholics. The broker found the defendant's property and secured from the defendant an option agreement under which Dade County could purchase the property. At the same time, the broker obtained a written brokerage contract from the defendant. Dade County accepted the option agreement, but the defendant refused to go forward with the sale because of a change in management. Dade County then began eminent domain proceedings. During the progress of these proceedings, the parties agreed to a price and the conditions of a judgment of condemnation. The broker sued for a commission but was unsuccessful in the trial court. On appeal, the court acknowledged that an eminent domain proceeding is not a sale and cited several of the cases referred to above as authority for the proposition. However, the court ruled that the brokerage contract was susceptible to being construed as a promise to pay a commission for the finding of a purchaser and that if under those circumstances the defendant had prevented the broker from obtaining a commission by wrongfully refusing to proceed with the sale, the broker would be entitled to recover his commission. The court reversed the summary judgment, observing that an issue remains upon the allegation "that the plaintiff found the purchaser and the defendant frustrated the sale by its own actions." 340 So.2d at 1256-57. Thus, the facts of Keyes were wholly different than those of the instant case because in Keyes the property owner had indicated its willingness to sell at a given price by signing the option and the county sought to make the purchase according to the terms of the option.
Giving appellees the benefit of all reasonable inferences, the most favorable interpretation of their contract is that Dr. Dauer employed them to find a purchaser of the property upon terms acceptable to him.[2] Appellees contend that there were no fixed terms and that all they had to do was to find a purchaser for the property. This is patently absurd. Following this logic, if appellees found someone ready, willing and able to purchase the property for $1, they would be entitled to a commission. Under the contract, if Dauer had advised appellees of terms which would be acceptable to him, they would have earned their commission by finding a purchaser willing to meet these requirements. However, the only price that Dauer ever quoted was $10,000 an acre, and there is no suggestion of the existence of a purchaser who was willing to pay this price.
Of course, this is not the only way that appellees could have earned their commission. If they had procured an offer to purchase for a lesser amount and Dr. Dauer had indicated that the offer was acceptable, they would have earned their commission *65 although he later changed his mind and declined to go through with the sale. Even if they had procured an offer which Dauer declined, but he then preempted them and negotiated his own sale with the prospective purchaser, they could make a strong claim for a commission. However, this did not occur because appellees never brought an offer to Dauer, and in any event, a condemnation is not a sale for purposes of claiming a commission. Since appellees failed to perform their contract, they were not entitled to a commission.
There is another reason why appellees should not prevail. They have never suggested that Mr. Pichowski obtained a brokerage contract for the sale of less than the entire 660 acres. Admittedly, there were some references in the correspondence that the county was expressing interest in acquiring less than the entire tract. However, appellees do not contend the correspondence was part of the brokerage contract because if they did they would also admit that the brokerage contract was one to "effect a sale" rather than to "find a purchaser," in that the correspondence continually refers to the broker's efforts to consummate a sale of the property. Obviously, a broker who finds a purchaser for 117 acres has not complied with a listing which encompasses 660 acres unless the owner accepts the offer to sell the lesser acreage. Since Dr. Dauer never accepted any offer to sell only 117 acres, there can be no recovery of the brokerage commission.
The main thrust of appellees' argument is that Dr. Dauer was put on notice by the Martino letter of June 1, 1977, that they intended to claim a commission even if the property was acquired by eminent domain. At the outset, it should be noted that nothing in this letter refers to the condemnation of less than the entire parcel. More significant, however, is the fact that this is not the brokerage contract upon which appellees make their claim. There was no discussion of the possibility of condemnation during the telephone call in which Mr. Pichowski obtained his contract from Dauer. The mere fact that the brokers referred to eminent domain once in their correspondence with Dauer did not have the effect of broadening the scope of the listing. To accept the proposition that Dauer had to repudiate this incidental reference to condemnation at the risk of being held to having acquiesced to an amendment of the brokerage contract would place an intolerable burden upon an owner who testified that he was receiving correspondence from thirty to fifty brokers who were trying to sell his property.
A great portion of appellees' contacts with the county was directed to the selling of Mr. Pichowski's property, for which they were paid a commission. The fact that Dr. Dauer was advised that appellees were also trying to interest the county in his property did not place upon him an obligation to tell them to back off. The county was a potential purchaser along with many others, and it was natural for appellees to be discussing the property with potential purchasers. When it became apparent to Dauer that appellees seemed to be trying to negotiate on his behalf with the county, he had his administrative assistant terminate whatever listing then existed. He ultimately took over the negotiations with the county, but he turned down the only offer the county made. If appellees had obtained an offer from the county to purchase at a price acceptable to Dr. Dauer, they would have been entitled to a commission. They did not do so, and there was no evidence that they were prevented from doing so.
Finally, without saying it in so many words, appellees seem to be arguing that since Dr. Dauer knew they were trying to pique the county's interest in the property and the county ultimately acquired at least a portion of the property, they should be entitled to be compensated for their efforts on a quantum meruit basis. They cannot sustain this position because they did not sue on a quantum meruit theory. In any event, no matter how much time appellees spent with the county, there is no basis for any recovery because they failed to meet the requirements of their brokerage contract. See Wilson v. Frederick R. Ross Investment Co.; Emerson C. Custis & Co. v. *66 Tradesman's National Bank & Trust Co. The fact that Dauer knew of their efforts with the county cannot change the result. A brokerage contract is much like an attorney's contingent fee contract. Despite the most diligent efforts, there is no fee without accomplishment of the results contemplated by the contract. That is why the fee which is authorized in those cases where the contract is successfully performed generally exceeds the amount of compensation which would be recoverable if payment were being made on a quantum meruit basis.
We reverse the order finding that appellees are entitled to a commission and remand the case with directions that the trial court enter judgment against them.
HOBSON, A.C.J., and BOARDMAN, J., concur.
NOTES
[1] At the time of this appeal, the condemnation award had not yet been determined.
[2] There are two types of real estate brokerage contracts. The first entails the employment of a broker to procure a purchaser for the property of another while the second involves the employment of a broker to effect a sale of the property. Knowles v. Henderson, 156 Fla. 31, 22 So.2d 384 (Fla. 1945). Since appellees prevailed in the trial court, we must accept their interpretation of the Dauer telephone conversation that they obtained a "find a purchaser" brokerage contract. However, even under this type of contract, in order for the broker to obtain a commission, his prospect must be ready, willing and able to perform upon the terms fixed by the seller. Id.