875 So.2d 375 (2004)
ST. JOE CORPORATION, f/k/a St. Joe Paper Company, Petitioner,
v.
H. Bruce McIVER, Respondent.
No. SC02-2491.
Supreme Court of Florida.
February 5, 2004.
Rehearing Denied June 2, 2004.
*376 Kenneth G. Oertel and C. Anthony Cleveland of Oertel, Fernandez & Cole, P.A., Tallahassee, FL, for Petitioner.
*377 Law Offices of R. Stuart Huff, Coral Gables, FL; Ben H. Wilkinson of Pennington, Moore, Wilkinson, Bell & Dunbar, P.A., Tallahassee, FL; and Adam Lawrence of Lawrence & Daniels, Miami, FL, for Respondent.
CANTERO, J.
We consider whether a real estate broker can ever be entitled to a commission under an oral brokerage agreement where the broker, with the seller's consent, helped negotiate not a sale, but a condemnation of the property. In the decision below, the First District Court of Appeal held that, under certain circumstances, a condemnation could constitute a sale for purposes of a brokerage commission. See McIver v. St. Joe Corp., 828 So.2d 394, 396 (Fla. 1st DCA 2002). This holding expressly and directly conflicts with Dauer v. Pichowski, 413 So.2d 62, 63-64 (Fla. 2d DCA 1982), which held that a condemnation proceeding can never constitute a sale for such purposes. We accepted jurisdiction to resolve the conflict. See art. V, § 3(b)(3), Fla. Const. For the reasons we explain below, we approve the result of the First District's opinion. Contrary to the district court's reasoning, however, we hold that general contract principles should apply to determine whether, in a particular case, the seller and the broker agreed to pursue condemnation as an alternative to a sale.

I. FACTS
The trial court in this case granted summary judgment in favor of the defendant, petitioner St. Joe Corporation. Therefore, we must examine the record in the light most favorable to the respondent, H. Bruce McIver, as the non-moving party. See, e.g., Markowitz v. Helen Homes of Kendall Corp., 826 So.2d 256, 259 (Fla. 2002). We recognize that some of these facts may be disputed, but at this point in the litigation we must accept McIver's version as true.
McIver had long represented St. Joe in real estate matters, often on a handshake. In 1988, he again orally contracted with St. Joe to provide consulting services and to act as St. Joe's broker for the sale of a 600-acre parcel of environmentally sensitive land known as "Topsail." Under the oral agreement, St. Joe would pay McIver two percent of the sale price. At the time, although the parties contemplated that the State of Florida would purchase the property through its Conservation and Recreation Lands (CARL) program, apparently neither party mentioned the possibility of a condemnation.
Negotiations with the State continued for several years. At various points, St. Joe confirmed to the State that McIver was its agent for purposes of the sale of Topsail and would be entitled to a two percent commission.
McIver's efforts significantly increased the property's value. In 1989, due in part to his experience with the CARL process and his efforts on St. Joe's behalf, the State placed Topsail on its CARL acquisition list, which is a prerequisite to the State's purchase of such property. McIver's continuing efforts caused Topsail to gradually move up the list from seventeenth in 1989 to first in 1994.
Despite the property's movement to the top of the CARL list, negotiations with the State stalled in 1994 due to differences over the purchase price. The State offered $25.7 million, but St. Joe wanted no less than $50 million. St. Joe also did not receive an acceptable offer from any other potential purchaser.
According to McIver, at this point he proposed to St. Joe the idea of condemnation to break the impasse. McIver knew *378 that before condemnation, the State bases its purchase offer on the property's then-existing zoning, but after condemnation proceedings begin the State could base its offer on the property's highest and best use, regardless of current zoning. That difference was significant for the Topsail property. Although originally the property had been zoned for multiple units per acre, in 1993 the State directed Walton County to amend its comprehensive plan to downzone Topsail to one unit per every five acres. McIver knew that condemnation proceedings would allow St. Joe to negotiate a price based on the earlier, higher-density zoning. McIver also knew that the State's practice was not to condemn CARL lands unless the landowner agreed.
McIver talked to St. Joe about several ways to break the impasse, including convincing the State to condemn the property. St. Joe's Chief Executive Officer, Jacob Belin, told McIver to "see what [he] could get done" to increase the property's value.
In accordance with St. Joe's direction, McIver proposed to the State that the parties proceed by condemnation. In the summer of 1994, the State asked McIver to confirm with St. Joe that it was amenable to a "friendly condemnation."[1] McIver explained the process to Belin, who directed McIver to "tell them to condemn it." McIver communicated St. Joe's agreement to the State.
The State initiated eminent domain proceedings in September 1994. Although St. Joe privately consented to the proceedings, formally, through its pleadings, it objected, contesting the issue of public purpose for the taking. Although at first blush formal opposition to condemnation proceedings appears inconsistent with consent, testimony showed that such opposition was sometimes used as a bargaining tool to negotiate a favorable price. Moreover, evidence showed that the State's condemnation of CARL lands is always consensual; it will not condemn environmentally sensitive lands without owner consent. In this case in particular, the State told McIver that it would not institute condemnation proceedings unless St. Joe agreed.
In October 1994, shortly after the State instituted the condemnation proceedings, Belin first warned McIver that St. Joe would not pay him a commission if the property was condemned; only if it was sold. Three weeks after the State filed the complaint, St. Joe directed the State to address any further communications to St. Joe's attorney.
The trial court eventually granted St. Joe's motion to dismiss the condemnation proceeding. While the State's motion for rehearing was pending, however, the State and St. Joe agreed to a consent final judgment. Under its terms, the State paid $84 million for Topsail.
McIver then filed a complaint against St. Joe seeking to recover a two percent commission on the eventual sale price as reflected in the consent final judgment. McIver asserted claims for breach of contract, quantum meruit, and unjust enrichment. The trial court granted summary judgment for St. Joe on all counts. The court relied on the bright-line rule in Dauer, 413 So.2d at 63-64, holding that *379 condemnation could never constitute a sale for purposes of a brokerage commission. The trial court concluded that because McIver's commission was contingent on a sale, the fact that he might have been a procuring cause of the property being acquired by condemnation was not enough, unless the contract expressly stated that a condemnation would entitle McIver to the commission. The trial court also ruled that the equitable remedies of quantum meruit and unjust enrichment claims (counts II and III) were not available where an express contract on the subject matter exists.
On appeal, the district court affirmed summary judgment on the quantum meruit and unjust enrichment claims, but reversed on the breach of contract claim. See McIver, 828 So.2d at 396. The court analyzed the factors outlined in Wilson v. Frederick R. Ross Inv. Co., 116 Colo. 249, 180 P.2d 226 (1947), and adopted in Dauer, 413 So.2d at 63-64, for determining whether a transaction can be considered a sale for purposes of a real estate brokerage commission. See McIver, 828 So.2d at 397. According to Wilson, a transaction constitutes a sale when the owner (1) agrees on the property to be sold; (2) concurs as to the time at which he is to give up possession; and (3) has the power to negotiate a satisfactory price. Id. (citing Wilson). Whereas in Dauer the district court held unequivocally that "condemnation meets none of these tests," 413 So.2d at 64, the district court in McIver held that the factors "should be examined in light of the facts in each case." McIver, 828 So.2d at 397. The court applied those factors and concluded that "McIver presented evidence from which a jury might conclude that the conveyance in this case satisfied the `tests' in Dauer and thus constituted a `sale' for purposes of his broker's commission." Id. at 398. St. Joe then sought review in this Court.

II. ANALYSIS
We must determine whether condemnation can ever constitute a sale for purposes of a real estate brokerage commission. To answer that question, both the district court below and the case that conflicts with it, Dauer, applied the three-factor test the Colorado Supreme Court originally announced in Wilson, 180 P.2d at 226. As explained below, however, we conclude that Wilson's three-part test is ill-suited to situations where the seller and broker specifically contemplated condemnation as an alternative to a sale. In such cases, we believe ordinary contract principles should apply to determine the existence and parameters of such an agreement. Therefore, we (A) discuss Wilson and why its three-part test does not apply to voluntary condemnations; and (B) apply contract principles to determine whether the seller and broker in this case intended that condemnation would constitute an acceptable substitute for a sale.

A. Wilson and Its Progeny
Wilson, decided in 1947, was the first case to consider whether a real estate broker was entitled to a commission for condemnation of the property. In Wilson, the federal government was interested in purchasing land. It met with a broker, explaining the type of land it wanted and warning that any brokerage fee would have to come from the landowner. The broker obtained a willing seller, and the parties signed several option agreements on a piece of land. The government then filed condemnation proceedings on part of that land. When the broker did not receive his commission, he sued for breach of contract and quantum meruit. At trial, the broker dropped the contract claim and proceeded solely on the quantum meruit claim. Thus, the issue on appeal was *380 whether the broker had adequately stated a claim in quantum meruit.
On appeal, the Colorado Supreme Court noted that the case presented the "clear-cut issue of whether the unexpected condemnation by the government" of property that had been the subject of traditional sales negotiations "operates as a sale so as to entitle the brokers to a commission." 180 P.2d at 229 (emphasis added). As the court noted, "[a]t no time was the possibility of condemnation mentioned to the landowner" and there was "no indication ... that the landowner agreed to sell her property under any arrangement other than that contained in the written options." Id. at 228-29. The court characterized the government's condemnation action as a "sudden avalanche from the mountains above ... without warning to the owner." Id. at 231.
The court in Wilson denied the broker a commission. It reasoned that in a condemnation proceeding, the owner cannot designate or negotiate the property to be sold, cannot determine when the grantee may take possession, and cannot refuse to transfer the property if the offered price is inadequate, but must either reach an accord or litigate the question of just compensation. Id. The court did not intimate that its holdingand the factors it createdwould apply where the owner sought condemnation.
Since Wilson, several courts, including Dauer, have held that condemnation can never constitute a sale for purposes of a brokerage commission. See Dauer, 413 So.2d at 63-64; Preston v. Carnation Co., 196 Cal.App.2d 43, 16 Cal.Rptr. 240 (1961); Haigler v. Ingle, 119 Colo. 145, 200 P.2d 913 (1948); Shaw v. Ave. D Stores, Inc., 115 N.Y.S.2d 194 (1952). The rule is not always strictly applied, however, and some courts have considered the facts of a particular case. See Tyler v. Seiler, 76 Misc. 185, 136 N.Y.S. 394 (App. Term 1912) (allowing a commission where the city condemned the property in order to clear a defect in the seller's title that had prevented a voluntary sale); Keyes Co. v. Florida Nursing Corp., 340 So.2d 1254 (Fla. 3d DCA 1976) (acknowledging the rule that condemnation does not equate to a sale but concluding that, despite condemnation, a factual issue remained about whether the owner frustrated the sale to avoid a commission). A recurring theme of these cases is that when property is condemned, the owner is not a willing seller. See, e.g., Preston, 16 Cal.Rptr. at 243-44. Like Wilson, cases adopting its three-part test also involved condemnations thrust upon the owner. See, e.g., Lundstrom, Inc. v. Nikkei Concerns, Inc., 52 Wash.App. 250, 758 P.2d 561, 563 (1988) (involving the initiation of condemnation proceedings against a non-consenting property owner); Dauer, 413 So.2d at 63 (involving a condemnation against a landowner after it had rejected the State's offer for a traditional sale).
This case, however, presents substantially different circumstances. Viewed in the light most favorable to the plaintiff, the seller not only consented to the condemnation, it specifically sought condemnation when a traditional sale appeared unlikely. McIver suggested that condemnation would achieve the best possible price because the property's value would be based on its highest and best use, and St. Joe agreed to pursue condemnation.
While Wilson may apply where the condemnation was involuntarywe do not decide that question herewe do not believe it was intended to apply where the property owner authorized the broker to seek *381 condemnation.[2] In the circumstances of voluntary condemnations, whether a broker is entitled to a commission for condemnation of property should be analyzed according to ordinary contract principles, including those applicable to oral contracts and contract modification. The focus should be on the agreed scope of the broker's employment, not on extraneous factors such as when the state should take possession. We now discuss those principles and apply them to this case.

B. Applying Contract Principles
An oral contract, such as the one in this case, is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms. See W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc., 728 So.2d 297, 302 (Fla. 1st DCA 1999) (mentioning basic contract principles as applied to an oral contract claim). The fact that nonessential terms remain open is not fatal to an oral contract. See W.R. Townsend Contracting, Inc., 728 So.2d at 301; Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit Co., 773 So.2d 96, 97 (Fla. 2d DCA 2000). Finally, a party who asserts an oral contract must prove its existence by a preponderance of the evidence. Batista v. Walter & Bernstein, P.A., 378 So.2d 1321, 1322 (Fla. 3d DCA 1980).
Oral brokerage contracts, like other oral contracts, are valid and enforceable. See Edgar Realty & Assocs., Inc. v. Mobley, 513 So.2d 1350, 1351 (Fla. 1st DCA 1987) (holding that a real estate broker's allegations of an oral contract with prospective purchasers stated a cause of action); 7 Fla. Jur.2d Brokers § 5 (1997) (providing that a contract of employment between a broker and a principal may be oral or written); 12 Am.Jur.2d Brokers § 51 (1997) (same); cf. Futch v. Head, 511 So.2d 314, 317 (Fla. 1st DCA 1987) (holding that sufficient evidence existed of an enforceable oral commission agreement between a broker and a co-broker and sustaining the verdict).
Applying these principles to brokerage commissions for condemnation of property, if the seller and the broker agreed to, and did, pursue condemnation as an acceptable substitute for a sale, then the broker should be entitled to a commission when the property is condemned. If, however, the seller specifically authorized the broker to pursue only a sale, then the broker would not be entitled to a commission for a condemnation.
In this case, it is undisputed that a valid oral contract existed whereby, at least, McIver would act as broker to obtain the sale of Topsail, and would receive a two percent commission. Generally, where the parties acknowledge creation of a contract and the disagreement concerns their varying understandings about certain terms, such questions are properly submitted to a jury. See, e.g., Pan American Bancshares, Inc. v. Trask, 278 So.2d 313, 314 (Fla. 3d DCA 1973).
The next issue is whether and how the parties to an oral contract can orally modify it. It is well established that the parties to a contract can discharge or modify the contract, however made or evidenced, through a subsequent agreement. Carolina Metal Prods. Corp. v. Larson, 389 F.2d 490 (5th Cir.1968); 17A Am. Jur.2d Contracts § 513 (1991) (stating that *382 a contract may be superseded or modified by another contract); cf. H.I. Resorts, Inc. v. Touchton, 337 So.2d 854, 856 (Fla. 2d DCA 1976) (holding that the parol evidence rule did not bar introduction of evidence of a subsequent oral contract concerning the broker's right to a commission and modifying the written agreement); 7 Fla. Jur.2d Brokers § 55 (1997) (stating same). Whether the parties have validly modified a contract is usually a question of fact. See Kiwanis Club of Little Havana, Inc. v. de Kalafe, 723 So.2d 838, 841 (Fla. 3d DCA 1998) (holding that whether a contract has been modified by subsequent oral agreement or course of dealing is a question of fact for the jury); cf. Transammonia Export Corp. v. Conserv, Inc., 554 F.2d 719, 724 (5th Cir.1977) (holding that evidence regarding the existence of an oral contract and its subsequent modification supported the jury's verdict); Willamette-Western Corp. v. Lowry, 279 Or. 525, 568 P.2d 1339, 1341 (1977) (holding that the evidence was sufficient for the jury to find that an oral agreement existed and that it was not modified).
Under Florida law, the parties' subsequent conduct also can modify the terms in a contract. In re General Plastics Corp., 158 B.R. 258 (Bankr.S.D.Fla. 1993); Danforth Orthopedic Brace & Limb, Inc. v. Florida Health Care Plan, Inc., 750 So.2d 774 (Fla. 5th DCA 2000); see also Lalow v. Codomo, 101 So.2d 390, 393 (Fla.1958) (noting that "the actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract"). We note, however, that a party cannot modify a contract unilaterally. All the parties whose rights or responsibilities the modification affects must consent. See Binninger v. Hutchinson, 355 So.2d 863 (Fla. 1st DCA 1978); United Contractors, Inc. v. United Constr. Corp., 187 So.2d 695 (Fla. 2d DCA 1966). Moreover, the modification must be supported by proper consideration. See, e.g., Wilson v. Odom, 215 So.2d 37 (Fla. 1st DCA 1968).
In this case, genuine issues of material fact remain about whether St. Joe and McIver modified the brokerage agreement to authorize McIver to pursue a State condemnation of the property as a viable alternative to a sale. Although St. Joe preferred to sell the property to the State and the State was interested in buying it, negotiations stalled on one crucial term: the price. According to McIver, as a way of breaking the impasse he suggested that St. Joe propose condemnation to the State. A condemnation would allow the parties to value the property based on its highest and best use, which would include a greater density (and therefore a higher value) than the density allowed by the current zoning. St. Joe authorized McIver to pursue condemnation, which he did. These facts, if proven at trial, would establish a modification of the oral brokerage agreement to include pursuit of condemnation as well as a sale. We therefore approve the result of the First District's decision, which was to reverse the summary judgment on the breach of contract count.

III. CONCLUSION
For the reasons stated, we approve the result the district court reached and disapprove Dauer to the extent that it holds that a condemnation can never constitute a sale for purposes of a brokerage commission. In this case, genuine issues of material fact exist about whether the seller and the broker agreed to pursue condemnation as an alternative way to sell the property. We decline to address the remaining issues, such as respondent's argument that summary judgment also was inappropriate on the remaining counts of the complaint, *383 because they are beyond the basis for our conflict jurisdiction. See, e.g., Kelly v. Cmty. Hosp. of Palm Beaches, Inc., 818 So.2d 469, 470 n. 1 (Fla.2002) (declining to address issues that were beyond the scope of the Court's conflict jurisdiction).
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, and BELL, JJ., concur.
NOTES
[1] In a friendly condemnation, the State agrees to condemn property that the owner desires for the State to condemn, and the State buys the property at an arms-length negotiated price. Cf. E. Thirteenth St. Cmty. Ass'n v. N.Y. State Urban Dev. Corp., 84 N.Y.2d 287, 617 N.Y.S.2d 706, 641 N.E.2d 1368, 1372 (1994) (characterizing a friendly condemnation as one in which "the condemnee desires the condemnation as ardently as does the condemnor").
[2] The court in Wilson may have implied its limited reach when it noted that "as a matter of practice a real estate broker can protect himself by disclosing to his principal the possibility of condemnation proceedings and cover this contingency in his contract for commission." 180 P.2d at 232.