[Civ. No. 14291.   First Dist., Div. One.   Jan. 5, 1951.]

O. R. WEST, Appellant, v. HUNT FOODS, INC. (a Corporation), Respondent.

Theodore M. Monell for Appellant.

W. F. Williamson and Percy J. Creede for Respondent.

PETERS, P. J.—Plaintiff was discharged by defendant company in October of 1944. He brought this action to recover certain salary claimed to be due to him, and to recover certain retirement benefits to which he claims he is entitled. At the close of plaintiff's case a nonsuit was granted. Plaintiff appeals.

It is elementary law that ''A trial court is justified in granting a motion for nonsuit '. . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms*, 210 Cal. 200, 202 [291 P. 190] . . .) [Citing several cases.] As stated in *Estate of Lances*, [216 Cal. 397, 14 P.2d 768] *supra*, page 400, 'Unless it can be said as a matter of law, that . . . no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.' '' (*Blumberg* v. *M. & T. Incorporated*, 34 Cal.2d 226, 229 [209 P.2d 1].) When the evidence here involved is tested by these standards it is apparent that it was error to have granted the nonsuit.

The complaint is in two counts. The first is for salary from the date plaintiff was discharged until October 31, 1945, less certain payments received, it being alleged that plaintiff was an officer of defendant; that he was employed pursuant to a resolution of the board of directors of defendant for the fiscal year starting March 1, 1944, at a fixed salary and bonus and improperly and illegally discharged on October 20, 1944, when his salary and bonus were discontinued; that according to the bylaws of defendant all officers are elected for one year by resolution of the board of directors, and continue in

office until their successors are appointed; that his successor was not appointed until October 31, 1945.

The second cause of action is for retirement benefits. It is there alleged that it has been the policy of defendant to pay a pension amounting to fifty per cent of salary at the time of retirement to employees with many years of service, plus the assumption by the company of certain insurance premiums; that the president of the defendant, Norton Simon, and the vice-president and general manager of the company, Frederick Weisman, "promised and agreed" that such arrangement would be carried out with plaintiff, and that such a pension would be paid to plaintiff if he would continue as treasurer and later as assistant treasurer; that plaintiff so agreed and performed the duties of his office; that he was improperly discharged in October of 1944, and has not received the promised pension.

The sole witness at the trial was plaintiff. He testified that he first went to work for defendant company as auditor in 1918, and in the next year became treasurer and a director; that except for several short periods of time he was a director until 1940; that he continued to act as an officer—either treasurer or assistant treasurer—until his discharge on October 20, 1944; that there were several reorganizations of the company during these years; that in February, 1943, one Norton Simon secured control of defendant and became its president; that in February of 1943 Simon told plaintiff that one of the factors that had influenced him to acquire control of the company was that he had been assured that the old staff would continue under the new management; that Simon then asked plaintiff if he would continue as treasurer; that plaintiff replied that he would stay under certain conditions. His exact testimony on this point is as follows: "I said to him that my position was that I was receiving a certain salary and in accordance with a practice or a policy that had been established and in force ever since I had been with the company, since 1918, I was to receive on my retirement, whenever that date took effect, the same treatment that had been accorded to other employees retiring either by reason of age or infirmity or other reasons, after they had served the company for a number of years, and explained to Mr. Simon that that had been in effect for quite a number of years; in fact, since I had been there. His reply to me was that he had no intention whatsoever of changing any practice with relation to treatment of employees or anyone

else that had been established and in effect." He also testified that: "I told him that it had been the practice on retirement of such employees as I mentioned, that they had received a retirement pay of one-half of their salary at the time of retirement, and the company would assume the payment of their group life insurance premiums which previously had been shared by the employee and the company."

Plaintiff then testified that Simon replied "that he was very happy that I had decided to stay, and he then said that when the time came for me to retire, he would personally see that the arrangement that I had explained to him as being in effect in the past would be carried out in my case."

Plaintiff also testified that all during the years that he had been a director of defendant the matter of pensions and retirement pay had been held by the board of directors to be a matter controlled by management not requiring the approval of the board, and that pensions were always fixed by the officers, usually the president.

The conversation with Simon took place in February, 1943. Following that conversation, and in reliance upon the promises then made, plaintiff remained with the company as treasurer. In June of 1943 he had a conversation on the subject with Frederick Weisman, the vice-president and general manager of the defendant. This conversation took place at a time the company was contemplating moving its offices from San Francisco to Hayward, and Weisman asked if plaintiff would move to Hayward. Plaintiff demurred on the ground that he only had at best a few years to work for the company—he was then 67—and that he did not want to retire then and find himself located in Hayward. Plaintiff testified that Weisman agreed that this was a logical objection. He also testified that he had another conversation with Weisman sometime between July and October, 1943; that in this conversation he and Weisman first discussed problems relating to the salaries of other employees, and then he pointed out to Weisman that, after the 1943 reorganization, he was the only one of the old employees that had not received a raise in salary. Weisman replied: "I fully realize that, Mr. West, and I know you are correct, but I want to point out to you that it would be relatively only a few years until we are going to retire you and you will then be paid a retirement pay or pension." He also testified that Weisman stated that in a few years when he retired "we will then have to pay

you a retirement pay or pension, in accordance with your agreement with Mr. Simon.''

In April of 1944 Simon asked plaintiff to step down from treasurer to become assistant treasurer at the same salary and bonus he was then receiving, explaining that because he, Simon, was located in Southern California it would be more convenient to have the treasurer located in the south. Plaintiff agreed, and ''pointed out to him [Simon] our previous agreement in regard to retirement pay, saying to him that it would be but a few years that I would have to retire and I reminded him of our agreement and he said that the agreement we had would remain in effect and it was satisfactory to him.''

Plaintiff, in reliance on these promises, continued in the employ of defendant until October 20, 1944. On that date Weisman told him that he had been removed from the payroll as of October 15th, and that the company would not pay him a pension; that the company had applied to the proper governmental board for permission to pay him severance pay of $9,000, but the board had approved the payment of but $3,900; that that sum and no more would be paid to him. These statements were later verified by Simon. Both Weisman and Simon requested plaintiff's resignation, but plaintiff refused to resign.

In January and February, 1945, plaintiff received from defendant checks totalling $4,800 (less withholding taxes) which he endorsed ''Accepted on Account,'' and which he deposited in his account in September, 1945.

In discussing the past policies of the company in reference to retirement benefits, plaintiff named about six employees out of the several hundred employed by defendant that had received some sort of benefits from the company upon leaving its employ. He also named one officer who had turned down a retirement allowance in favor of a cash settlement, and another, who, while not officially retired, was aged and ill and inactive during the last years of his life during which he was paid full salary. Plaintiff admitted that he did not know of any policy of the defendant establishing a definite age for retirement, claiming that each case was decided on its merits.

Plaintiff introduced a bylaw of the defendant providing that officers shall be elected and appointed by the board of directors, and another providing that ''The President shall have general supervision and direction of all other officers of the corporation and shall see that their duties are faith-

fully performed.'' Another bylaw providing that officers are elected for one year and until their successors are appointed was also introduced.

On this evidence the trial court granted a nonsuit, holding that plaintiff had failed to prove any cause of action. This conclusion is correct as to the first cause of action—for back salary. While the last bylaw above mentioned might have supported a prima facie case that plaintiff was entitled to remain an officer until his successor was appointed by the board (and this was not done until October of 1945), plaintiff's other evidence refuted this cause of action. The resolution, appointing plaintiff treasurer, fixed his salary at $6,200 per annum, plus a bonus. He received his monthly salary from March 1, 1944, to October of 1944, totalling $3,874.95, and a pro rata bonus of $1,000. He received a severance allowance of $3,800. Thus he has already received more than his yearly salary for 1944. Moreover, after he was fired in October of 1944, he immediately found another job and has been steadily employed ever since. Therefore, he has not been and was not available for work with defendant up to October of 1945, and is not entitled to salary for that period.

The trial court also was correct in holding that plaintiff had failed to prove a custom of defendant to pay retirement benefits to officers and employees upon which he relied to his detriment. While it is undoubtedly the law of this state that, where the employer has a fixed pension plan and the employee knows of it and continues in the employment in the honest belief that he will be the recipient of such plan, the employee may enforce his right to a pension (*Hunter* v. *Sparling*, 87 Cal.App.2d 711 [197 P.2d 807]), in the instant case plaintiff's proof falls far short of showing that the employer had a fixed plan for retiring employees. There is no substantial evidence to show that defendant had a pension or retirement policy. The evidence to the effect that, during the more than 25 years plaintiff had been connected with defendant, the company had paid some unfixed sum to six employees out of the several hundred at all times employed, falls far short of showing the existence of such a fixed policy.

But custom and reliance is not the only theory pleaded in the second cause of action. There is also pleaded a specific agreement between the defendant and plaintiff to pay him, upon his retirement, half salary for life plus certain insurance benefits. The evidence supports this cause of action. Plaintiff testified that he told Simon, when the latter took over

control of the company, the precise terms of what he believed and understood the retirement policy of the company was, and that Simon told him that if he remained with the company he, Simon, had no intention of changing that policy, and would, upon plaintiff's retiring "personally see that the arrangement that I had explained to him . . . would be carried out in my case." While this conversation alone would not be sufficient to prove a contract to pay a pension, because it was based upon a misunderstanding of the existence of a custom, several months later, after Simon and the other officers of the company had full opportunity to investigate the truth of plaintiff's representations, Weisman, the vice-president and general manager of defendant, refused plaintiff an increase in salary because plaintiff would retire in a couple of years and the company "will then have to pay you a retirement pay or pension in accordance with your agreement with Mr. Simon." More than a year after the first conversation with Simon, and in April of 1944, Simon, upon being reminded of the pension agreement, stated that such agreement "would remain in effect and it was satisfactory to him."

That evidence is sufficient, under the rules already set forth, to require a denial of the motion for a nonsuit. That evidence, on such a motion, is sufficient to establish a prima facie case based on the theory of an express oral agreement to pay plaintiff a fixed pension if he would remain with the company as treasurer. Plaintiff fully performed. ▬▬ The fact that plaintiff's understanding of the policy of this company in reference to pensions may have been in error, is not necessarily decisive of the action. Certainly, Simon knew or must have known between February of 1943 and March of 1944 that no such policy existed, and that plaintiff was laboring under a misapprehension on the subject. Nevertheless, Simon saw fit to renew his promises in March of 1944. Instead of telling plaintiff that he was in error, Simon and Weisman continually referred to the agreement and reaffirmed it, and led plaintiff to believe the agreement existed.

Although Simon's first promise was to treat plaintiff in accordance with defendant's retirement custom or policy, and no such custom or policy existed, plaintiff definitely and precisely told Simon what he, plaintiff, believed that policy to be. The conversations with Simon and Weisman during the next 13 months can be construed either as promises by Simon and

Weisman to pay plaintiff a pension in accordance with what he believed that nonexistent custom to be, or they constituted deliberate misrepresentations to plaintiff as to the intentions of the company, intended to induce him to remain with the company. If the conversations be so construed they might well raise a promissory estoppel.

According to the Restatement of Contracts, section 90, a promissory estoppel is defined as follows: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (See *Hunter* v. *Sparling*, 87 Cal.App.2d 711, 725 [197 P.2d 807].)

The evidence, on a motion for nonsuit, was sufficient to establish a prima facie case on either of these two theories. It cannot be successfully argued that, as a matter of law, plaintiff failed to prove that Simon, as president, and Weisman, as vice-president and general manager, did not have authority to make the contract or representations on behalf of the company. The president and general manager are presumed to have such authority. (*Grummet* v. *Fresno Glazed Cement Pipe Co.*, 181 Cal. 509, 513 [185 P. 388].)

The judgment and order of nonsuit are reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 3, 1951.