327 So.2d 101 (1976)
Jackie GLEASON, Appellant,
v.
LEADERSHIP HOUSING, INC., Appellee.
No. 74-799.
District Court of Appeal of Florida, Fourth District.
January 16, 1976.
Rehearing Denied February 24, 1976.
*102 Hugo L. Black, Jr., Kelly, Black, Black & Kenny, Miami, for appellant.
Gilbert A. Haddad, Preddy, Haddad, Kutner & Hardy, Miami, for appellee.
OWEN, Judge.
Appellant, the vendee under a written land-sales agreement, suffered an adverse judgment in his suit for specific performance (later amended to seek damages) apparently because the trial court concluded that the agreement violated the Statute of Frauds[1] due to the insufficiency of the description of the property to be conveyed. We reverse the judgment and hold that the vendor, by its conduct, was estopped to contest the validity of the agreement.
In March 1969, appellant, Jackie Gleason, a renowned entertainer and show business personality, entered into a written contract with the Behring Corp. (predecessor to appellee, Leadership Housing, Inc.). Executed amid much fanfare and publicity, the agreement called for Behring to employ Gleason for a period of five years giving Behring the right to use Gleason's name to publicize and promote its planned real estate development on a 3,000 acre tract which it owned in Broward County. In addition to lending his name to the promotion, Gleason was required to render services in connection with the designing of a golf course and related golfing facilities and was to continue in his efforts to obtain the promotion and staging of a major outstanding golf tournament on the course to be construed. In exchange, Gleason was to receive a specified monthly salary (the first twenty-three monthly payments of which were to be allowed to accrue and to be paid thereafter on a deferred basis), and was granted (1) the privilege of leasing a residence to be construed on the property by Behring, and (2) the right to purchase a portion of the 3,000 acre tract at a designated "bargain" price. This latter provision is the basis of the present suit and is discussed in more detail hereafter.
The relevant part of the provision relating to the land sale was as follows:
"Within sixty days from the date hereof Behring will sell and convey to Gleason ... 732,000 square feet [16.8 acres] of land in fee simple absolute, at a price of 15¢ per square foot [$6,534 per acre]. The land will be located in the area where the first high-rise residential buildings in the complex will be constructed, it will be zoned for high-rise residential use, and shall be so located as to be on a street or streets to be installed by Behring at its expense in connection with the initial phase of the development. The selection of the land will be subject to the approval of both parties."
The agreement also provided that should Behring fail to obtain a financing commitment for the planned development, then:
"[A]ll rights and obligations under the Employment Contract shall cease and terminate, as shall Behring's obligation to construct and lease the house to Gleason and the various options to be contained in such lease, and any obligation for accumulated salaries due Gleason shall be extinguished. However, Behring shall in any event be obligated to complete the land sale referred to in Section III above as therein provided, so long as Gleason has for such eight-month period fulfilled the obligations imposed upon him under the terms of this agreement."
The final paragraph of the agreement provided as follows:
"It is contemplated that the parties will execute more formal agreements of employment, lease with options and land deed and mortgage, embodying all the foregoing terms and such additional terms and provisions as the parties in *103 good-faith negotiations shall agree upon. However, this Memorandum of Agreement shall constitute a binding agreement between the parties until such time as such formal agreements are executed or if no formal agrements are executed."
From the time the contract was signed, Behring publicized Gleason's connection with its development and Gleason substantially performed the services required of him, i.e., the designing of a golf course and related facilities and the exerting of his efforts to obtain and stage (at a future date) a major golf tournament for the proposed course. However, Behring was unable to obtain the necessary financing commitment for the development and thus, pursuant to the terms of the agreement, the parties' respective rights and obligations thereunder terminated with the exception of Behring's obligation to complete the land sale to Gleason.
Within sixty days after the contract was signed, Gleason's attorney reminded Behring's attorney of the contractual obligation to convey the land and sought definitive arrangements concerning selection of the parcel and a closing. In response to this and similar inquiries, Mr. Ken Behring, the principal in Behring Corporation, stated that Gleason "was sitting on a million dollars' worth of land" and advised that Gleason simply wait until some of the land was zoned for high-rise residential use so as to assure selection of land meeting the contract standards. In June 1970, Gleason's attorney again reminded Behring's attorney of Behring's obligation to convey the land, and again Behring's attorney confirmed that the obligation existed and stated that Mr. Ken Behring had discussed the obligation with the directors of the company. In November 1971, in response to a similar inquiry, Behring again confirmed its obligation under the agreement and reported that it had just obtained the necessary zoning. Gleason's attorney was advised that a representative of Behring Corporation would meet with him and drive through the property to select a suitable parcel. During the next six weeks similar representations were made and then on January 28, 1972 Behring actually proposed a tract consisting of 18.3 acres, but not zoned for high-rise residential use. Gleason disapproved this proposed site because it did not meet the zoning standards of the contract. On February 15, 1972, Behring then proposed "Tract 27, being 18 acres more or less," which land was zoned for high-rise residential use. Gleason also disapproved this proposed site because, while it met zoning standards of the contract, it did not meet the location requirements since it was not in the area where the first high-rise residential buildings in the complex were to be constructed. Although Behring then designated one of its officers to propose another parcel to Gleason, no other site was ever again proposed by Behring. However, at no time prior to the filing of the suit did Behring ever deny its obligation under the contract.
On September 1, 1972, control of the Behring Corporation changed hands and the name of the corporation was changed to Leadership Housing, Inc. This suit was initially filed seeking specific performance of the contract, but later was amended to seek damages. A nonjury trial resulted in a final judgment adverse to Gleason, apparently on the basis of the court finding that the agreement violated the Statute of Frauds and therefore would not support an action for damages.
At the outset we would make the observation, in passing, that a plausible argument could be made to the effect that the land description contained in the agreement was not so vague as to bring the contract within the Statute of Frauds, despite the fact that it failed to denominate a specifically identifiable 732,000 square feet of land. It is readily apparent from the face of the contract that these parties did not intend to define a specific tract of land, susceptible of metes and bounds description. They clearly intended to contract for *104 the purchase and sale of a fungible 732,000 square feet of land  any parcel or parcels meeting the contract standards as to zoning and location would have been adequate to satisfy this intent  and to the extent that the contract standards were specific and certain, the land description could be said to have been as well. It is true that the contract provided that the selection would be "subject to the approval of both parties," but this could be viewed as a subsidiary matter as to which the law would imply a covenant on the part of the respective parties to agree to a reasonable determination in order that the main promise may be enforced. 1 Williston, Contracts, § 48 at 157 (3rd ed., 1957); Ontario Downs, Inc. v. Lauppe, 192 Cal. App.2d 697, 13 Cal. Rptr. 782 (1961). Additionally, it could be said that such a provision was one which either party could waive and once one party had indicated approval of a particular parcel, that party would not be prejudiced if the other party subsequently acquiesced in the selection. However, our decision in this case does not rest upon any determination that the agreement did not violate the Statute of Frauds. On the contrary, assuming for the purpose of our decision that the agreement was, in fact, in violation of the Statute of Frauds, we hold that appellee is estopped to contest the validity of the agreement under the doctrine of equitable estoppel. 73 Am.Jur.2d, Statute of Frauds, §§ 565 et seq. (1974); 5 Thompson, Real Property § 2528 (1957).
The principles of law upon which we rely were concisely set forth in United Contractors, Inc. v. United Construction Corp., 187 So.2d 695, 701-2 (Fla.App. 2nd, 1966) as follows:
"`Equitable estoppel' precludes a person from maintaining a position inconsistent with another position which is sought to be maintained at the same time or which was asserted at a previous time; and, as a general rule where a person has, with knowledge of the facts, acted or conducted himself in a particular manner, or asserted a particular claim or right, he cannot afterward assume a position inconsistent with such act or conduct to the prejudice of another who has acted in reliance on such conduct. The doctrine requires of a party consistency of conduct, when inconsistency would work substantial injury to the other party. 31 C.J.S. Estoppel § 108, page 548, et seq.; Rosello v. Hayden, Fla. 1955, 79 So.2d 682; Fairlie v. Scott, 1924, 88 Fla. 229, 102 So. 247; Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, 5 Cir., 1935, 75 F.2d 13. The doctrine of estoppel is a part of the common law enforced in Florida, and it should be appropriately applied when the facts in a litigated case justify it. Steen v. Scott, 1940, 144 Fla. 702, 198 So. 489. As stated in Warren v. Tampa Mortgage Investors' Co., 1933, 112 Fla. 555, 150 So. 738, text 741: `[t]he law is too well settled to admit of controversy that one may not accept the fruits of a contract and at the same time renounce, or repudiate, the burdens which that contract places upon him.'"
See also, Hodkin v. Perry, 88 So.2d 139 (Fla. 1956); O'Bryan v. Linton, 41 So.2d 169 (Fla. 1949); 12 Fla.Jur., Estoppel and Waiver, §§ 46, 50 et seq. (1957); 31 C.J.S. Estoppel, §§ 109, 110 (1964); 28 Am.Jur.2d, Estoppel and Waiver, §§ 59, 60, and 68 (1966).
The facts of this case clearly justify application of the doctrine. Appellee in this litigation has sought to adopt, to Gleason's prejudice, a position completely inconsistent with that taken by it prior to litigation, and upon which Gleason relied, in that appellee's predecessor, Behring, continuously over a three-year period led Gleason to believe that the contract was valid and that land meeting the contract standards would be conveyed to him. Gleason continued to rely upon this position to his detriment particularly when he rejected Behring's proposal to convey to him Tract 27, for had he known that appellee *105 would subsequently shift its position from one of recognition of the obligation to one contesting the validity of the agreement, he could have acquiesced in the selection of Tract 27 as a palatable alternative to the present litigation. Moreover, appellee clearly accepted the benefits of the contract, i.e., the use of Gleason's name and his efforts toward designing a golf course and securing a major golf tournament to be played thereon at a subsequent date, for all of which Gleason has to date received nothing. It is clear from the terms of the contract that the parties anticipated that while Behring would receive immediately this benefit, Gleason could conceivably receive no benefit whatever other than the "bargain" land sale should the other provisions of the contract self-terminate. At trial, expert witnesses testified that any of the property was worth substantially more than the price called for by the contract. Even Mr. Behring stated, within approximately two months after the contract was signed, that Gleason was "sitting on a million dollars' worth of property." Whether Behring got that much value from the use of Gleason's name and his services up to the time the contract was terminated is not the issue; rather, it is simply that in exchange for receiving such benefit Behring agreed to sell at a bargain price 16.8 acres of land so that Gleason could ultimately realize a gain therefrom. Having thus consistently, prior to this litigation, manifested an intention to honor the contract and having accepted the benefits due it thereunder, appellee is now estopped to deny its validity.
Appellant concedes that the only relief now available to him is an award of damages. We feel that the proper measure thereof should be the value of 16.8 acres located in Tract 27 as of February 15, 1972 (the date that Behring indicated its approval of this parcel as meeting the contract requirements) less the contract purchase price of 15¢ per square foot ($6,534 per acre), plus interest on the amount thus obtained computed from February 15, 1972 to the date of judgment.
The judgment is reversed and this cause remanded for the entry of a judgment in accordance herewith. On remand the trial court, in its discretion, may take further evidence touching upon the issue of damages as it deems necessary or desirable.
Reversed and remanded.
WALDEN, C.J., and CROSS, J., concur.
NOTES
[1] Fla. Stat. § 725.01 (1973).