CONSORTIUM INFORMATION SER-
VICES, INC., a California corpo-
ration, Plaintiff—Appellee,

v.

CREDIT DATA SERVICES, INC., a
Florida corporation, Defendant—
Appellant.

Consortium Information Services, Inc.,
a California corporation,
Plaintiff—Appellant,

v.

Credit Data Services, Inc., a Florida
corporation, Defendant—
Appellee.

Nos. 03–56139, 03–56140.

United States Court of Appeals,
Ninth Circuit.

Argued & Submitted May 2, 2005.

Decided Aug. 1, 2005.

Scott William Davenport, Esq., Manning & Marder et al, LLP, Los Angeles, CA, for Plaintiff–Appellee.

Jay–Allen Eisen, Jay–Allen Eisen Law Corp., Sacramento, CA, for Defendant–Appellant.

Before: O'SCANNLAIN and WARDLAW, Circuit Judges, and LOVELL,* District Judge.

## MEMORANDUM **

Credit Data Services, Inc. ("CDS"), appeals the district court judgment, following a bench trial, and $1.2 million damage award to Consortium Information Services, Inc. ("Consortium") on a claim of promissory estoppel. Consortium cross-appeals, challenging the damage award as inadequate. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. Choice of Law

■ The district court correctly determined that the law of the forum state, California, as opposed to Florida law governs this action. "We review[ ] decisions concerning the appropriate choice of law de novo." *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1505 (9th Cir.1995). CDS failed to timely assert the Florida statute of frauds as a defense. Federal Rule of Civil Procedure 8(c) lists "certain matters that a party must plead affirmatively, among which matters is the defense of the Statute of Frauds." *Morgan Elec. Co. v. Neill*, 198 F.2d 119, 122 (9th Cir.1952). "Failure to plead this defense results in waiver of it" under Rule 12(h). *Id.* CDS raised the California statute of frauds in its answer to Consortium's complaint, and relied upon California law in its summary judgment papers. It did not raise the Florida statute of frauds as a defense until oral argument on its summary judgment motion a year and three months after the suit was initiated. Because CDS failed to timely assert the Florida statute of frauds, under federal procedural law, it was precluded from asserting it so late in the litigation.

Although the district court concluded that CDA was equitably estopped from raising the Florida statute under California law, we may "affirm on any ground supported by the record even if it differs from the rationale of the district court." *Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir.2004). We need not reach the district court's alternative holding that the "governmental interests" test leads to the same result.

## II. Promissory Estoppel

■ The district court made extensive factual findings, none of which is clearly erroneous, and correctly concluded that CDS was bound by the California doctrine of promissory estoppel to compensate for the injury to Consortium by its failure to live up to the promises it made, upon which Consortium relied to its detriment. California law provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee ... and which does

---

* The Honorable Charles C. Lovell, Senior United States District Judge for the District of Montana, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Kajima/Ray Wilson v. Los Angeles County Metro. Transp. Auth.*, 23 Cal.4th 305, 96 Cal.Rptr.2d 747, 1 P.3d 63, 66 (2000). As the district court pointed out, CDS reasonably should have expected its promises to induce Consortium's reliance because CDS (1) promised Consortium to reduce the agreement to writing, (2) continually assured Consortium that the parties had a deal, (3) knew that Consortium had a limited time to find a new credit report provider, and (4) insisted that Consortium begin performance before the contract was reduced to writing. Consortium reasonably relied upon CDS's promises, to its detriment, by (1) discontinuing its search for another vendor, (2) acquiring a line of credit from the bank, and (3) informing its customers that their accounts were being transferred to CDS. As a result of CDS's actions, Consortium lost its book of customers, was, in essence, forced to turn over its customer base to CDS without payment, and was unable to enter into another contract because it lost all its vendors. Thus, the district court correctly determined that promisory estoppel applied because the resulting "injustice can be avoided only by enforcement of the promise" made by CDS. *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F.Supp.2d 1086, 1095 (C.D.Cal.1999).

### III. Amount of Damages

■ The district court did not clearly err in awarding $1,288,226 in damages. "We review the district court's computation of damages following a bench trial for clear error." *Howard v. Crystal Cruises, Inc.*, 41 F.3d 527, 530 (9th Cir.1994). The usual remedy in promissory estoppel cases is enforcement of the promise, and the damages are measured by the extent of the obligation assumed and not performed.

1 Witkin, Summary of California Law, Contracts § 250 (9th ed. Supp.2004). California law authorizes "the exercise of judicial discretion in promissory estoppel cases to fashion relief to do justice." *Signal Hill Aviation Co. v. Stroppe*, 96 Cal. App.3d 627, 158 Cal.Rptr. 178, 186 (1979). The district court correctly calculated that if CDS had performed its part of the bargain, Consortium would have continued to sell credit reports at the rate and the rate of growth at which the company had previously been selling for a net profit of $.45 per report. As a result of losing its book of business in reliance upon CDS's promises, after August 18, 1999, until May 2001, when Consortium was able to find another vendor but was barred by Experian's actions from entering into the business, Consortium suffered reliance damages of $1,288,226. The district court acted well within its broad equitable discretion to award damages through April 2001.

**AFFIRMED.**

LOVELL, District Judge, dissenting.

I respectfully dissent.

In this case, a solo operator domiciled in California approached an established Florida business, traveled to Florida for negotiations, pursued the deal avidly, and contemplated a contract that required the application of Florida law. When the Florida corporation determined the deal would be financially disadvantageous, it pulled out of negotiations. The United States District Court for Central District of California concluded that the California businessman should receive the benefit of California law and the windfall of the proceeds of a contract that the Florida party chose not to sign. The majority of this panel of the Court of Appeals affirms this decision. I must dissent. I believe the district court erred in several ways. I

would reverse and remand with instructions to apply the law of the state of Florida and dismiss the case, based on the statute of frauds. In the alternative, I would find there was no promissory estoppel. Finally, the damages awarded by the district court were excessive.

## A. Choice of Law

The district court erred in its analysis of the choice of law question, both in its conclusion that Defendant raised the issue too late and in its analysis of the merits. The majority opinion considers only one of the grounds addressed by the district court. This dissent considers both.

### 1. Equitable Estoppel

CDS timely raised the choice of law issue. The district court incorrectly concluded that CDS was equitably estopped from raising Florida law.

A district court's decision to apply equitable estoppel is reviewed for abuse of discretion. *Leong v. Potter*, 347 F.3d 1117, 1121 (9th Cir.2003). A district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of a material fact. *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1020 (9th Cir.2002). A reviewing court cannot reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir.2001). I conclude the district court made just such an error here.

The district court cited two cases in its order, *Danzig v. Jack Gryberg & Assoc.*, 161 Cal.App.3d 1128, 208 Cal.Rptr. 336, 343 (1984), and *Riley v. Fitzgerald*, 178 Cal.App.3d 871, 223 Cal.Rptr. 889, 891 (1986), both of which involved issues the court determined were not timely raised.

In *Danzig*, Defendant Gryberg did not challenge class certification until after the court issued proposed findings of fact in the case. The appeals court determined that Gryberg had waived his objection by not filing an appeal earlier, but in particular, the court noted special interests in having class certification issues dealt with at the outset of a case. In fact, special interlocutory appeals procedures exist for those issues. *Danzig*, 1136. The court in *Danzig* never mentions "equitable estoppel."

The second case cited by the district court, *Riley v. Fitzgerald*, is equally inapplicable to the case at hand. In *Riley*, Plaintiffs agreed to use Texas law in the district court, but then argued in the appellate court that California law should apply. The appeals court concluded the argument had been waived by Plaintiffs' actions below and therefore would not be considered on appeal. *Riley*, at 891–92. And again, in *Riley* there is no mention of equitable estoppel in the context of a waived argument regarding choice of law.

Nonetheless, the district court in this matter decided, based on these two cases, that "Defendant is equitably estopped from now asserting Florida law." Generally, the doctrine of equitable estoppel applies when the party to be estopped knows facts that the other party does not, and the first intends for the second to rely on his or her conduct, which the second does, to his detriment. Equitable estoppel appears in different forms in different contexts, but the basic premise is that a party relies to his detriment on the knowing conduct of the other.

In this instance, three facts undermine reaching that conclusion. First, there is no suggestion of deceit on CDS's part. CDS pleaded the statute of frauds in its Answer, though it cited the California and

not Florida statute. From the beginning, Plaintiff and the district judge had formal notice that Defendant relied on the statute of frauds.

Second, CDS raised the choice of law issue almost two full months before trial, at the summary judgment hearing in November, though it was not briefed and argued until January, after the judge requested briefs following the final pretrial conference. Consortium had to spend time briefing the issue right before trial, but they were in no way injured by the late briefing. The issue was one of pure law; there would be no further discovery required to respond, nor would trial preparation have to change (though in fact there would probably *be no trial* if Florida law was used).

Third, the final pretrial order, signed by the parties and the judge, included the Florida statute of frauds as CDS's second defense. Paragraph 14 of the final pretrial order says, in part, "the parties having specified the foregoing issues of fact and law remaining to be litigated, this pretrial conference order shall supercede the pleadings and govern the course of this cause ..." Likewise, Fed.R.Civ.P. 16(e) *requires* such an order to "control the subsequent course of the action," unless modified. The district court's later order on choice of law (and, by extension, the availability of the statute of frauds as an affirmative defense) was apparently such a modification. However, Consortium cannot be heard to cry foul that it was not sufficiently apprised of the Florida statute of frauds defense or that it was not given ample time to argue the merits. Nor did this in any way disadvantage the court.

Finally, and perhaps most important, is the fact that in the upcoming trial, Plaintiff was planning to argue that a contract had been formed between these parties. That contract, in draft, included a choice of law

provision that chose Florida, a selection Plaintiff never disagreed with. Therefore, Consortium would have had to argue at trial in favor of a contract the very terms of which required Florida law to govern disputes.

I conclude there was no deceptiveness on the part of CDS, no undue delay in raising the choice of law issue and no unfairness to Consortium to require the use of Florida law in this case. Plaintiff–Appellee had abundant notice that Florida law might apply and, hence, it was an abuse of discretion for the district court to conclude CDS was equitably estopped from raising the issue. The district court's ruling was unjustifiably harsh and punitive considering its dispositive nature. Granting it deference only magnifies the injustice.

2. Merits of the Choice of Law Question

The majority affirmed the district court's choice of California law on the timeliness ground and never reached the merits of the choice of law question. Because I believe the Florida statute of frauds clearly was timely raised, I must analyze the district court's choice of California law. A district court's decision concerning the appropriate choice of law is reviewed de novo. *See Alvarez–Machain v. United States,* 331 F.3d 604, 632 (9th Cir.2003) (en banc).

The parties agree on the test that determines which law applies to a choice of law question: California's "governmental interest" analysis found in *Liew v. Official Receiver and Liquidator,* 685 F.2d 1192, 1196 (9th Cir.1982). *See also Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1005 (9th Cir.2001). ("A district court in a diversity case must apply the same choice of law analysis that would be applied by state courts in the jurisdiction in which the district court is situated." *Liew,* at 1195.) In

this analysis, the court must first determine whether the substantive law of the two jurisdictions differs. Second, if the laws differ, the court determines whether both jurisdictions have an interest in having their laws applied. If so, then, third, the court proceeds under the "comparative impairment" approach, to determine which jurisdiction's interest would be more impaired if its policy were subordinated to the other jurisdiction's. *Liew*, at 1196.

Both Florida's and California's statutes of frauds bar enforcement of an oral contract the term of which is greater than one year. California Civil Code § 1624; F.S.A. Chap. 725.01, F.S.2002. The important difference in this case is that Florida law disallows promissory estoppel as a method of recovery that evades the statute of frauds. *Tanenbaum v. Biscayne Osteopathic Hospital, Inc.*, 190 So.2d 777, 779 (Fla.1966); *Shore Holdings, Inc. v. Seagate Beach Quarters, Inc.*, 842 So.2d 1010 (Fl.App. 4 Dist., 2003); *Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.*, 262 F.Supp.2d 1334 (S.D.Fla. 1999).[1] California law does not. *Kipperman v. Dixson (In re Diego's, Inc.)*, 88 F.3d 775 (9th Cir.1996). Consortium argues that there is no real difference between the states' laws because equitable estoppel can be relied on in Florida to avoid the statute of frauds, citing *United of Omaha v. Nob Hill Associates*, 450 So.2d 536, 540 (Fla.Ct.App.1984) and *Gleason v. Leadership Housing, Inc.*, 327 So.2d 101, 104 (Fla.Ct.App.1976). Both cases are easily distinguished and a difference remains in the laws of California and Florida.

The facts in *Gleason* are substantially different because the violation of the statute of frauds there was an insufficient description of land in a written contract, not an absence of a written contract altogether. Plaintiff in that instance had performed his part of the contract for three years before Defendant raised objections to the wording of the contract. The concerns of unfounded claims and faulty memories inherent in oral agreements did not apply to that case, and Gleason had performed his part of the contract in a way that Consortium never did here. States often use estoppel to prevent deceitful reliance on the statute of frauds to get out of legitimate obligations. Eric Mills Holmes, *Corbin on Contracts* at 46. That is far from the issue at hand here.

The pertinent exchange in *United of Omaha v. Nob Hill Associates* occurred when one party to a written contract asked for an extension of time to complete its performance. The dispute was whether there had been an oral modification to the contract. The appellate court determined that though any oral modification was barred by the statute of frauds, the evidence at trial demonstrated that defendants had waived its right to use the statute of frauds as a defense, because the other party had changed its position based on the conduct of the defendants-had detrimentally relied on statements of the defendants. Therefore, defendants were equitably estopped from relying on the statute of frauds.

There is a distinction between equitable estoppel and promissory estoppel, and the way to make sense of Florida's lack of promissory estoppel in *Tanenbaum* and approval of equitable estoppel in other contexts is to cleave to that difference. In a situation in which no contract exists and parties are negotiating the possibility of a future contract, as in *Tanenbaum* and the

---

1. Florida is in the minority of states with this policy. Most states allow promissory estoppel to overcome a failure to meet the statute of frauds. Eric Mills Holmes, *Corbin on Contracts* vol. 3, § 8.11, 46 (Joseph M. Perillo, ed., rev. ed., West 1996).

case at hand, there is reason not to bind people by statements they have made in the negotiations. In the absence of any written agreement, it is too speculative to consider what people might have meant by their attempts to seduce one another into business deals. On the other hand, once two parties have a written contract and an established business agreement, their tendency toward puffery should be reduced. In *United of Omaha*, defendants held all the cards, because they were financing a real estate development and could have pulled the plug at any moment once plaintiffs had breached. In that instance, promising to allow someone an extension of time and then relying on the fact that it was not a written agreement is inequitable in a way that CDS' conduct in this case is not. Equitable estoppel is not a bar, and Florida's law does differ from California's.

The second step is whether each jurisdiction has an interest in having its own law applied. In analyzing this question, the district court concluded that the statute of frauds is intended as a shield against unfounded claims and since Consortium's claims here had survived summary judgment, they were clearly not unfounded. Therefore, the district court concluded, Florida's interest in preventing frivolous litigation was served without its prohibition on promissory estoppel, despite *Tanenbaum's* clear statement that "[t]he statute [of frauds] should be strictly construed to prevent the fraud it was designed to correct, and so long as it can be made to effectuate this purpose, courts should be reluctant to take cases from its protection." 190 So.2d at 779.

CDS argues a two-fold interest for Florida in its law being applied. First, much of the conduct at issue in this matter took place in Florida, including Esquinas' travel to Orlando to negotiate the contract, CDS is a Florida corporation, the draft contract included a Florida choice of law provision, and all of CDS's actions in this case took place in Florida. Therefore Florida has a strong interest in the activities in the state being governed by Florida law. Second, CDS contends that Florida's statute of frauds bars *all* oral agreements intended to last more than one year, not just those based on "loose verbal statements and innuendos" (quoting *Tanenbaum*, at 779). Fla. Stats. Ann. § 725.01. Florida's statute of frauds also protects residents from claims based on faulty memory and perjury.

Consortium did not have a compelling argument for California's particular interest in the case, except that Consortium is a California corporation and the credit reports requested would be dealing with California customers and be used in California. Consortium's resp. br., 25. In addition, the district court did not have a persuasive argument on this point, stating only that Consortium's case was not like that contemplated in *Tanenbaum* and therefore "Florida does not have an interest in applying its law."

I strongly disagree with Consortium and the district court's conclusion that Florida has no interest. A Florida business is being sued on a claim that Florida statutory and case law would bar. The contract being negotiated, though in the end it was not signed, contained a Florida choice of law provision. Florida's public policy strictly enforces the statute of frauds, and a Florida businessman can have confidence in negotiating a deal that the negotiations will not result in an unwanted, unintended obligation. Florida has sufficient interest to survive step two.

California's public policy is to protect individuals who have relied to their detriment on promises of various sorts. California has led the way in using promissory estoppel to circumvent formal bars such as

the statute of frauds. *See Frebank Co. v. White*, 152 Cal.App.2d 522, 313 P.2d 633, 635 (1957) (in employee suit, applying promissory estoppel to enforce employer's promise to pay bonus of $4,000 annually); *West v. Hunt Foods, Inc.*, 101 Cal.App.2d 597, 225 P.2d 978, 983 (1951) (applying promissory estoppel to enforce corporation president's promise to pay a pension in accordance with a corporate policy that employee reasonably thought was the corporation's policy but it was not); *Hunter v. Sparling*, 87 Cal.App.2d 711, 197 P.2d 807, 815–16 (1948) (applying promissory estoppel as alternative ground to enforce the employer's obligation to pay the balance of a retirement allowance). California sees greater risk in leaving those who rely on promises unprotected than those who rely on the formalism of the statute of frauds.

Third, then, the court must compare the interests of California and Florida and determine which jurisdiction has a greater interest. For simplicity's sake, one can assume that each jurisdiction has the same interest based on geography, that an equal amount of activity occurred related to the business relationship in each state. Given that, from a policy perspective, which state (and its residents) would lose more from the application of the other state's law? CDS argues for Florida's interest in protecting its citizens by using the statute of frauds expansively as a shield. CDS points out the irony, as it calls it, of the district court's determination that in fact there was no contract, i.e., Consortium's claims *were* unfounded as far as an oral contract went, and the statute of frauds served its purpose.

Consortium argues that California's interest is greater in protecting its citizens from the nefarious behavior of people like CDS who make promises and then back out. Consortium cites instances from the record in which promises to deal were

made. One need not question any of the district court's factual findings to reject Consortium's characterization of CDS's conduct as "reprehensible business conduct".

If Florida's strict public policy can be overcome whenever a Florida business negotiates with an out of state business, Florida's internal policy becomes moot. Judges in California, who have developed the availability of estoppel to subvert the statute of frauds, would, in effect, overrule the legislated public policy of Florida and its citizens. On the other hand, California already has a statute of frauds and its business residents are aware that public policy bars certain oral contracts. Indeed, in the record below, Consortium's Esquinas made clear that he always intended to sign a written contract and he was aware that a written contract bestowed upon him rights that did not exist with an oral contract. Therefore, if Florida's law is applied, a California citizen who knew certain oral contracts were unenforceable would be on notice that a writing was necessary. On the other hand, a Florida resident, who also knows these oral contracts are not enforceable, is disadvantaged when doing business with residents of other states because what is truly "mere puffery" in business negotiations may result in legal liability, despite both parties knowing that an oral contract of this type is not enforceable or intended to be enforced unless reduced to writing.

Consortium cites two cases to buttress its claim of California's interest in "protecting its citizens from falling victims to unscrupulous business tactics." However, both of these cases, in which implied-in-fact contracts were found, were not instances in which the contract was barred by the statute of frauds, either by California's looser standards or by Florida's stricter standards. *Grosso v. Miramax*

*Film Corp.*, 383 F.3d 965 (9th Cir.2004); *Landsberg v. Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193, 1196–97 (9th Cir.1986).

As CDS points out, the sum of Consortium's objections to Florida law is that someone in good faith could rely to his or her detriment on a promise to do business falsely made. However, CDS argues for a difference between reasonable and unreasonable reliance. The line must be drawn somewhere, and Florida's statute makes the line very easy to see. I would apply Florida law and remand the case for dismissal. However, if California law applies, we must proceed to the issue of promissory estoppel.

## B. Promissory Estoppel

The district court appears to have ignored the lodestar of the common law and the purpose of promissory estoppel and has thereby diminished the former and aggrandized the latter. To do so, in my view, was incorrect and to grant the ruling deference on appeal is not warranted.

I disagree that the district court properly found promissory estoppel. There are occasions when promissory estoppel will save an unfortunate, blameless party from the sometimes harsh formalism of contract law. However, in this case, the equitable life-ring should not be thrown to a party who was knowledgeable in business, who knew his rights were not protected until a written contract was signed, and who was profiting wildly from a business that his own counsel, at argument in the Court of Appeals, admitted no longer even exists in form because it sapped profits from the credit reporting agencies.

The district court concluded there was no oral contract because the parties did not agree on the following material terms: the length of the reseller agreement between CDS and Consortium, the length of the agreements between CDS and the auto dealers, and the grounds for terminating the subscriber agreements. In addition, there were some issues relating to price that were unresolved at the time CDs withdrew from negotiations. CDS argues that a court that found those "material, essential features of the agreement" missing could not by law then find promissory estoppel. CDS argues that promissory estoppel cannot apply when there is no agreement on essential contract terms, the manner in which CDS conducted negotiations does not support promissory estoppel, Consortium did not show that it reasonably relied to its detriment on the existence of a deal with CDS, and that Consortium's acts in reliance cannot support promissory estoppel because they were the very acts for which the parties were bargaining. CDS emphasizes the role of promissory estoppel as a substitute for consideration, that is, a way of enforcing agreements or understandings that were sufficiently clear to be contracts but lacked the consideration necessary to be contracts.

Consortium argues first that the district court's factual findings supporting promissory estoppel are sufficient and should not be questioned. Second, the promises made by CDS were not too vague to support estoppel. Third, substantial evidence supported the court's conclusion of both reasonable reliance and that the acts performed by Consortium support promissory estoppel. Consortium's approach is much more general, emphasizing the parties' intentions to be bound and the tiny details left undecided.

The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3)[the] reliance must be both reasonable and foreseeable; and (4) the party assert-

ing the estoppel must be injured by his reliance." *Laks v. Coast Federal Savings & Loan Assn.* (1976) 60 Cal.App.3d 885, 890, 131 Cal.Rptr. 836; *Kajima/Ray Wilson v. Los Angeles County Metropolitan,* 23 Cal.4th 305, 96 Cal.Rptr.2d 747, 750, 1 P.3d 63 (2000) (quoting Rest.2d Contracts, § 90, subd.(1), p. 242). "Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses." Fed.R.Civ.P. 52.

To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. *Ladas v. California State Auto. Ass'n,* 19 Cal.App.4th 761, 23 Cal.Rptr.2d 810, 815 (1993).

There are two sticking points in applying promissory estoppel in this case: whether there was a promise to do anything more than negotiate, and whether Consortium's reliance was reasonable and detrimental. There was no meeting of the minds-the district court concluded there was no oral contract because the parties did not agree on the length of the reseller agreement between CDS and Consortium, the length of the agreements between CDS and the auto dealers, and the grounds for terminating the subscriber agreements. However, CDS made repeated statements that "we have a deal" or "there's no reason not to go forward," and directed to Esquinas to get his auto dealers signed up. In its Conclusions of Law,

the district court concluded that CDS's statements that it would have its attorney draft a written agreement and fax it to Consortium amounted to a promise to "reduce the agreement to writing." Findings of Fact and Conclusions of Law, April 15, 2003, p. 16, ¶ 13. However, the district court cannot simultaneously assert that no contract was formed because material terms were undecided and that the writing would merely be a memorialization of an agreed-upon oral contract. CDS clearly promised to draft a contract, but the minds of the parties had not met over material terms, and therefore, CDS' promise could only have been a promise to continue to negotiate. As the California Court of Appeals stated in *Copeland v. Baskin Robbins U.S.A.,* "[w]hile courts have been increasingly liberal in supplying missing terms in order to find an enforceable contract they do so only where the reasonable intentions of the parties can be ascertained. It is still the general rule that where any of the essential elements of a promise are reserved for the future agreement of both parties, no legal obligation arises until such future agreement is made." 96 Cal.App.4th 1251, 117 Cal. Rptr.2d 875, 879 (2002). While CDS executives made reassuring statements to Esquinas about their intention to deal with him, both parties were fully aware of the details to be hammered out and the devil residing there. CDS made no clear promise to enter into a contract regardless of its terms and therefore, there is no enforceable promise.[2]

---

**2.** In *Copeland,* the Court of Appeals found a breach of the promise to negotiate. "For obvious reasons, damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the ne-

gotiates and may or may not include lost opportunity costs. The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement." *Copeland,* at 879. This analysis is revisited below.

The second hurdle on which Consortium stumbles is the reasonableness and extent of its reliance. As a conclusion of law, the district court found that CDS should have foreseen Consortium's reliance because of the limited time Consortium had to find an alternate source of credit reports, Esquinas' repeated expressions of urgency, CDS' Hanenburg's assurance that they had a deal, and CDS's direction to Esquinas to start to get his auto dealers signed up. This conclusion is not clearly erroneous. Nor is the district court's conclusion of law that Consortium did rely on CDS's promise by not looking for another vendor, procuring a $200,000 line of credit from a bank, as discussed by the parties, mailing membership applications and subscriber deals to its auto dealers, and telling the dealers their business was being transferred to CDS. These actions are in response to the deal that Consortium anticipated.

However, the court's conclusion that this reliance was reasonable is without supporting facts in the district court's order, the record or the law. Consortium and CDS always intended to reach a written agreement, and Esquinas testified that he wanted to "consummate" the agreement with a writing. Clearly he understood that a written agreement provided him with rights that an oral agreement to agree did not. One expects greater wariness from an experienced businessman who has been struggling for months to seal a deal. (Esquinas had worked for Experian for seven years and had been operating Consortium for five at this point.)

The district court stated that Consortium suffered injury due to its reliance. Again, CDS disputes this conclusion. CDS points to Consortium's difficulty in finding anyone to replace Abilene and the fact that Esquinas could not find another supplier until almost two years after CDS pulled out. Consortium did not establish that it passed up any alternative opportunity. At oral argument, counsel relied on the willingness of Monterey to enter into a deal with Consortium, but that possibility did not arise until twenty months after the CDS deal fell through. The record contains no evidence of any alternative vendor at any time prior to April of 2001. It appears CDS was Consortium's only opportunity. As CDS puts it, "Consortium ended up in exactly the same position it would have been in if CDS had turned down Esquinas at the outset and never opened negotiations in the first place." Br., 51.

Finally, the district court did not specifically address the crucial fifth factor listed in *Kajima/Ray Wilson:* whether injustice can only be avoided by enforcement of the promise. The court's unsupported conclusion is clearly erroneous. The answer to this dovetails with the last point above-if the parties had never negotiated, Consortium would have ended up in exactly the same place, without a supplier and therefore without a business. It failed to reach an agreement with Consortium and should not benefit from its failure to do so. Consortium made great hay at oral argument and in its briefs out of CDS's motivation for pulling out of negotiations-CDS was going to lose money if it entered into this contract and so it chose not to. Consortium would have us scorn CDS for this motivation, but there is nothing equitable or just about forcing a company to sign a contract that it determines will cause it financial damage. Profit from a fairly negotiated contract is not an inequitable motive. Justice will not be served to CDS if the promises are enforced, because it operated under the premises of contract law, that one is not liable for negotiations, and if material terms are not agreed upon, the parties walk away. Consortium would receive a windfall.

## C. Damages

The district court relied on its discretion to fashion appropriate relief on the promissory estoppel ground. It determined the amount of business Consortium had been doing from January until July of 1999, its rate of expansion of its business prior to that time, and its net profit per report during that time. The district court chose the date of being blacklisted by Experian as the end point for damages, and the total award was $1,288,266. This calculation is a hodgepodge meant to do justice by finding expectation damages (in the form of lost profits) but without the parameters usually required for such contract damages, such as a defined length of the contract and a set price per report. (Recall that at the last moment, Consortium offered to come down in price to get a deal.)

Promissory estoppel damages are intended to compensate someone for what their reliance on a promise cost them. Courts are reluctant to award lost profits in the absence of a written contract. *Kajima/Ray Wilson*, 96 Cal.Rptr.2d at 757, 1 P.3d 63. The remedy granted for breach may be limited as justice requires. Restatement Second of Contracts, Sec. 90(a). Consortium claims that the usual remedy in promissory estoppel cases is enforcement of the promise. However, the promise here is at most the promise to enter into a contract, since material terms of the contract to be entered were not yet reached and figuring out damages based on the lost contract is extremely speculative. As stated above in *Copeland v. Baskin Robbins*, a promise to negotiate a deal may always end in nothing. Therefore, awarding lost profits is improper.

The district court's award of $1.2 million is clearly erroneous. The parties did not form a contract. Consortium cannot expect to receive damages as if they had. Otherwise, the concept of contract means nothing, and negotiations become dangerous because one may be bound to a result that one never would have agreed to in writing. In addition, the district court assumed a rate of business expansion that was stale even as negotiations were ongoing, assumed an interest rate that is unrealistic for the time period discussed, and awarded damages for more than a year, when the contract may well have contained a year-to-year renewal provision, as CDS desired. Therefore, the district court appears to have awarded damages even greater than what Consortium could have recovered on a written contract. At the least, I would remand for a recalculation of damages based on what Consortium actually spent in reliance on the promise to negotiate.

### CONCLUSION

I accept and agree with CDS's authorities and arguments and believe the majority decision may have a chilling effect on commerce. For all the above reasons, regrettably, I am unable to join in the majority opinion.