Filed 1/6/15  Sector 10 v. Myers CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SECTOR 10 INC. et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>JASON MYERS et al.,<br><br>Defendants and Respondents. | A138529<br><br>(San Francisco City & County<br>Super. Ct. No. CGC11512617) |

**INTRODUCTION**

Plaintiffs Sector 10 Inc., Sector 10 Holdings Inc., and Sector 10 Services USA Inc. (Sector 10) appeal from a judgment in favor of defendants Jason Myers (Myers) and Bank of America, N.A. (the Bank) after the court granted their motions for summary judgment.  The underlying dispute arose out of a failed debt to equity conversion deal between Sector 10 Holdings, Inc. and Mariennie & Associates, Inc. (Mariennie).  Sector 10 claims Myers, the protective services manager of the Bank, induced Sector 10 to contract with Mariennie by misrepresenting it was a prerequisite for any contract with the Bank.[1]  We affirm the summary judgment.

---

[1] Neither Mariennie, nor its principal Jerry Bacal or any other Bacal-related entities, were named as defendants in this action.  Bacal's last name is sometimes spelled "Bacall" by the parties.  We refer to him as "Bacal."

**PROCEDURAL AND FACTUAL BACKGROUND**

*Sector 10's Communications With Myers*

Sector 10 described itself as a company "focused on developing patented, breakthrough emergency and first-responder technology to minimize the damage caused by catastrophic events." It alleged its "PLX-3D software [was designed to] track[] and communicate[] with first-responders and building occupants by voice and video and identif[y] evacuation routes, in real time," thus "chang[ing] the paradigm of the emergency response market."

In April 2009, Sector 10's chairman and chief executive officer, Pericles DeAvila (DeAvila), met with Myers, who was the protective services manager, but not an officer or director of the Bank. DeAvila and Myers discussed Sector 10's PLX-3D software, and, according to DeAvila, Myers said he " '[l]ove[d] it' " and told DeAvila it was "mission critical" to the Bank.

They scheduled a second meeting about a week and a half later, at which Myers indicated "they had space set aside in the Market Street building for [Sector 10] and . . . they would like to look at our agreements, our contracts." DeAvila "put together a package" which included exemplar contracts and delivered them to Myers. Myers told him he would "turn [them] over . . . to his boss and . . . that he would let us know what . . . or if we needed anything else."

DeAvila understood a contract would be required for the Bank to purchase Sector 10's products, but he believed "this was a done deal. We were just going through formality." He agreed, however, his "understanding in spring of 2009 was that for Sector 10 to be able to sell products to Bank of America, it would need to go through FBI background checks and have executed the contract agreements that [he] provided to Mr. Myers."

On June 25, DeAvila e-mailed Myers that he was "restructuring" Sector 10 "before we get going." Myers replied to his email, stating "Restructuring is never easy, wish I could give you a hand on the stock side. [¶] I still know a few folks who promote (and bring in equity groups) that are highly skilled. If you get in a jam or don't think

2

everyone is playing right with their stock compensation drop me a line." DeAvila responded "I will take you up on that! . . . [W]ith the new codes my own capital is no longer enough to grow properly. [¶] Yes, an introduction from you would be great!"

Around July 2, Myers introduced DeAvila to Jerry Bacal in a conference call between Myers, DeAvila, Bacal and Larry Madison, Sector 10's CFO. Myers described Bacal as "capable" "competent," and a "great guy for doing a stock deal." Myers "did a little brief on . . . converting [Sector 10's] debt and that we were in good hands with [Bacal]."

In mid-July, DeAvila had a meeting with Myers at which DeAvila "got pretty demanding about the . . . fact that we haven't received any communications back." DeAvila testified "At that meeting, he stopped me midway and basically said, 'You need to be in a stronger position financially. You have been talking with Jerry Bacal. That has to move forward. You are going up against ADT. [¶] And you know, don't worry about the bank. The bank's—that's there. . . . [¶] But the first thing you got to do is get the arrangement with Jerry Bacal complete and get you that money, because I don't want to bring you in if you don't have a strong enough balance sheet.' [¶] And that was my marching order from him."

Shortly thereafter, Sector 10 "executed a non-disclosure agreement with Desert Capital[2] so that Bacal could proceed to raise capital for Sector 10" via a debt conversion. On November 10, 2009, Sector 10 and Mariennie executed a "Contract for Assignment" of Sector 10 stock and a "Consulting Agreement." DeAvila also executed a back-dated "Contract for Assignment" with Desert Capital which was dated November 10, 2008, and a "Contract for Assignment/Conversion of Debt" with Mariennie back-dated November 10, 2008.

---

**2** Desert Capital was a Bacal-affiliated entity with the same business address as Mariennie. Mariennie was described in the contract as having "experience in the public markets" and "the expertise to maximize the value of the converted shares." The contract for assignment of Sector 10 stock with Desert Capital and the contract for assignment of Sector 10 stock with Mariennie identify Bacal as the CEO of each company.

3

Around the same time, Sector 10 was also attempting to sell its products to the San Francisco Fire Department. In November, 2009, DeAvila told the Fire Department his "trip to D.C. yielded a congressional group very interested in progressive Public Safety initiatives and in placing a large pool of money . . . . [T]he funds would be available for your department to equip all 1800 plus of your people, vehicles and so on . . . ." The Fire Department made a decision not to contract with Sector 10 around January 2010. The decision was based in part on "[b]udget constraints," and had nothing to do with Bank.

Sector 10 nevertheless entered into a consulting agreement dated February 18, 2010, with Gage Consulting, LLC (Gage), a lobbying group, to pursue federal funding to be used to assist the Fire Department in purchasing Sector 10 products. The parties agreed Gage would receive a percentage of the income from any business generated, but the efforts were unsuccessful. In February 2010 and again in September 2010, DeAvila falsely represented to the Fire Department that he had secured over $20 million in federal funds to be used by the Fire Department to purchase Sector 10 products. DeAvila continued to propose providing Sector 10 technology to the Fire Department to be financed by federal funds obtained "through their efforts with Gage Consulting Group." The Department specifically rejected these continued proposals in September 2010, stating "We have discussed the matter with the City Attorney and must decline. The Department is focusing on our core services and do not have the resources to commit to this project."

After Sector 10 filed its initial complaint in July 2011, the Bank investigated Myers's actions. It determined Myers engaged in unauthorized outside business unrelated to Sector 10 and inappropriate e-mails, both of which violated Bank policy. It terminated Myers's employment on September 9, 2011.

### The Bank's Demurrers and Summary Judgment Motion

The court sustained the Bank's demurrer to Sector 10's first amended complaint with leave to amend. It also sustained its demurrer to the second amended complaint with leave to amend as to the fraud, negligent misrepresentation and unfair competition claims, but overruled it as to the intentional and negligent interference with economic and

4

prospective advantage and negligent supervision claims. The Bank and Myers filed answers to Sector 10's third amended complaint.

After the Bank and Myers filed motions for summary judgment, the court granted Sector 10 leave to amend to add a new claim for promissory estoppel. Sector 10 then filed a fourth amended complaint adding that claim but eliminating its unfair competition claim.

The court subsequently granted the defendants' renewed motions for summary judgment, stating: "Each Defendant has sustained the initial burden of establishing that Defendant Myers made no actionable representation and Plaintiff failed to establish the existence of a disputed issue of material fact on that issue. This finding disposes of Plaintiff's causes of action for Fraud, Negligent Misrepresentation and Promissory Estoppel. . . . [¶] With respect to . . . Intentional and Negligent Interference with Economic and Prospective Advantage, Defendants have sustained their initial burden of demonstrating that neither Myers nor Bank of America interfered in any way with an existing or prospective economic relationship and Plaintiff has failed to demonstrate any material triable issue of fact on the issue. [¶] Plaintiff's Sixth Cause of Action for Negligent Supervision against Bank of America for Negligent Supervision of Myers is entirely derivative of the claims against Myers and fails along with those claims."

DISCUSSION

*Standard of Review*

"We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) "If no triable issue as to any material fact exists, the defendant is entitled to a judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo. [Citations.]" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499.) The trial court's stated reasons for granting summary relief are not binding on

5

the reviewing court, which reviews the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.)

***Fraud, Negligent Misrepresentation and Promissory Estoppel Claims***

Fraud, negligent misrepresentation and promissory estoppel all have in common the element of justifiable or reasonable reliance on a statement or promise. "Under California law, both fraud and negligent misrepresentation as causes of action require [plaintiff] to demonstrate it justifiably relied on [defendant's] misrepresentations" (*Glen Holly Entertainment, Inc. v. Tektronix Inc*. (9th Cir. 2003) 343 F.3d 1000, 1015), while promissory estoppel requires " 'reliance by the party to whom the promise is made.' " (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1016 (*Barroso*).)

Fraud requires "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co., Inc. v. Dana Corp*. (2004) 34 Cal.4th 979, 990.) Negligent misrepresentation similarly requires: "(1) The defendant must have made a representation as to a past or existing material fact, (2) which was untrue, (3) which, regardless of the defendant's actual belief, was made without any reasonable grounds for believing it was true, and (4) which was made with the intent to induce the plaintiff to rely upon it; (5) the plaintiff justifiably relied on the statement, and (6) plaintiff sustained damages." (*Cedars Sinai Medical Center v. Mid-West Nat. Life Ins. Co*. (C.D.Cal. 2000) 118 F.Supp.2d 1002, 1010.) " ' "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' [Citation.]" [Citation.]' " (*Barroso, supra,* 208 Cal.App.4th at p. 1016.)

" ' "Actual reliance occurs when a misrepresentation is ' "an immediate cause of [a plaintiff's] conduct, which alters his legal relations," ' and when, absent such representation," the plaintiff' 'would not, in all reasonable probability, have entered into the contract or other transaction.' [Citation.] To allege actual reliance with the requisite

6

specificity, '[t]he plaintiff must plead that he believed the representations to be true . . . and that in reliance thereon (or induced thereby) he entered into the transaction. [Citation.]'  [Citation.]"  (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1063.)

In the operative complaint, Sector 10 alleged Myers "knowingly made a series of affirmative, false and misleading statements to Sector 10 to induce Sector 10, under false pretenses, into a) disclosing its proprietary information in a series of engineering meetings at [the Bank]; b) issuing new corporate stock and c) granting Bacal the right to sell that stock."  In its brief on appeal, Sector 10 characterizes Myers' purported false statements as:  1) Sector 10's technology was "mission critical" to the Bank; (2) Myers had "taken the Bank Contracts 'up the ladder' and that Bank approval of the contracts was a 'formality' "; (3) Myers "assured Sector 10 that the Bank Contracts are 'there,' and directed them to raise financing with Bacall"; and (4) Myers told Sector 10 "he had not been following its dealings with Bacall."

As to Sector 10's claim it relied on the allegedly false statement Sector 10's product was "mission critical" to the Bank, "[f]raud may not ordinarily be predicated on mere statements of opinion regarding the value [or] general character . . . even though such assertions are greatly exaggerated.  (*Finch v. McKee* (1936) 18 Cal.App.2d 90, 93–94.)  "Representations of opinion, particularly involving matters of value, are ordinarily not actionable representations of fact."  (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 606.)  "A representation is an opinion ' "if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact; or (b) his judgment as to quality, value . . . or other matters of judgment." ' "  (*Id*. at pp. 606–607.) "[G]eneralized, vague and unspecific assertions, constitut[e] mere 'puffery' upon which a reasonable consumer could not rely."  (*Glen Holly Entertainment Inc. v. Textronix Inc.*, *supra*, 343 F.3d at p. 1015; see also *Garcia v. Superior Court* (1990) 50 Cal.3d 728, 743 (conc. opn. of Lucas, J.) [where "alleged statements of [defendants] were such casual expressions of opinion . . . plaintiff was not entitled to rely upon [them] under the circumstances.' [Citation.]"].)

"[W]hether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." (*Guido v. Koopman* (1991) 1 Cal.App.4th 837, 843, citing 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 289, p. 301.) " 'In determining whether one can reasonably or justifiably rely on an alleged misrepresentation, the knowledge, education and experience of the person claiming reliance must be considered.' " (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 132.) " 'If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery.' " (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1247.)

Myers's asserted statement that Sector 10's product was "mission critical" was simply a vague expression of his interest and opinion. It indicated only "his judgment as to quality," and was too vague and imprecise to induce reasonable reliance. Indeed, DeAvila agreed the "mission critical" comment did not obligate the Bank to purchase Sector 10 products. Moreover, given DeAvila's background as a businessperson and CEO, as a matter of law the vague and unspecified assertion Sector 10's products were "mission critical" to the Bank could not induce reasonable reliance on DeAvila's part.

As to Sector 10's assertion Myers' statements he had taken the contracts "up the ladder" and Bank approval was a "formality" were intended to induce Sector 10 to contract with Bacal-related entities, these, again, were neither specific factual representations nor the type of statements on which reasonable reliance can be placed. Even had Myers forwarded the draft contracts to his superiors for approval, DeAvila knew execution of the contracts was not a mere formality. Although DeAvila "believed" he had a "done deal" with Bank, he also testified he knew "in spring of 2009 . . . that for Sector 10 to be able to sell products to Bank of America, it would need to go through FBI background checks and have executed the contract agreements that [he] provided to Mr. Myers." Indeed, no CEO could reasonably rely on an oral representation by a non-officer of a major banking institution that execution of written contracts was a mere formality. As the court in *Phillippe v. Shapell Industries* explained, " 'The plaintiff, a

8

man of experience in this line of business, knew how to protect himself in the transaction but failed to do so.' " (*Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, 1261.)

As for the third claimed misrepresentation—Myers' statement: "[D]on't worry about the bank. The bank's—that's there"—Sector 10 maintains this was an "assur[ance] . . . that the Bank Contracts are 'there'." But "that's there," is again too vague to constitute a misrepresentation or a promise to award a contract to Sector 10. Moreover, DeAvila testified Myers stated, in the same conversation, that DeAvila needed to pursue financing with Bacal in order to improve his balance sheet because Sector 10 was in competition with ADT. Plainly, if Sector 10 was in "competition," no agreement had been reached between Bank and Sector 10.

Sector 10 further asserts "Myers' confirmation that the Bank Contracts are 'there,' which he gave Sector 10 following receipt of draft written agreements, is legally indistinguishable from the defendants' assurances that we have 'a deal', found to be actionable" in *Consortium Information Services, Inc. v. Credit Data Services, Inc.* (9th Cir. 2005) 149 Fed.Appx. 575 (*Consortium*). In *Consortium*, the court held Credit Data Services, Inc. (CDS) "reasonably should have expected its promises to induce Consortium's reliance because CDS (1) promised Consortium to reduce the agreement to writing, (2) continually assured Consortium that the parties had a deal, (3) knew that Consortium had a limited time to find a new credit report provider, and (4) insisted that Consortium begin performance before the contract was reduced to writing." (*Id.* at p. 577.) Accordingly, the district court correctly determined promissory estoppel applied because the resulting " 'injustice can be avoided only by enforcement of the promise' " made by CDS. (*Ibid.*)

Plainly, the circumstances in *Consortium* are far different than those here, and not "indistinguishable" as Sector 10 claims. Here, the evidence failed to show any promise by Myers to reduce an agreement to writing—at most, Myers agreed to pass along exemplar agreements to his superiors. In fact, those draft agreements were not even specific to the Bank—they were sample agreements that did not name the Bank, and

9

often included the names of other companies.[3] Moreover, none contained any material provisions, such as the price the Bank was to pay for Sector 10 products. Myers' "that's there" statement was not a promise to enter into a contract. DeAvila conceded "that for Sector 10 to be able to sell products to Bank of America, it would need to go through FBI background checks and have executed the contract agreements that [he] provided to Mr. Myers." And Myers never "insisted that [Sector 10] begin performance before the contract was reduced to writing." (*Consortium*, *supra*, 149 Fed.Appx. at p. 577.)

As to the last complained of misrepresentation—that Myers "had not been following [Sector 10's] dealings with Bacal"—even assuming being blind copied on certain e-mails constituted "following its dealings with Bacall," that statement could not have induced Sector 10 to contract with Bacal because it was made after Sector 10 had already done so. The contracts with Bacal were executed in November 2009, and the pivotal e-mail was sent April 26, 2010. Indeed, Sector 10 does not specify what reliance it placed on this claimed misrepresentation, or what the claimed misrepresentation induced it to do.

At oral argument, Sector 10's counsel urged fraud could be found based on the totality of the circumstances rather than individual comments. While fraud may be inferred from all of the circumstances in a case, (*Hart v. Browne* (1980) 103 Cal.App.3d 947, 957) the circumstances in this case, whether considered individually or in their totality, do not support that conclusion. Rather, all of the statements alleged to have been made by Myers were too vague to be considered promises, and no reasonable businessperson would justifiably rely on any of them.

Sector 10 lastly asserts the trial court erred in granting summary judgment on its promissory estoppel claim because the court had earlier granted it "leave to interpose its Fourth Amended Complaint adding its promissory estoppel claim." Sector 10 maintains that in rejecting defendants' opposition to the amendment, "Judge Miller necessarily

---

[3] Although DeAvila testified the draft contracts he provided were specific to the Bank, the documents produced by Sector 10 showed none of the exemplar contracts named the Bank.

determined that Myers' alleged promises are actionable." Sector 10 has conflated the issue of whether a complaint states a cause of action with whether summary judgment should be granted. The following from *Doe v. California Lutheran High School Assn.* is apposite: "[P]laintiffs argue that the trial court's ruling conflicts with previous rulings in the case. Early on, defendants demurred on multiple grounds, including that the School was not a business enterprise under the Unruh Civil Rights Act[4]; the trial court overruled the demurrer on this ground. . . . However, because the demurrer concerned the pleadings, whereas the motion for summary judgment concerned the evidence, the two rulings were not inconsistent." (*California Lutheran* (2009) 170 Cal.App.4th 828, 834–835.)

### *Interference With Prospective Economic Advantage Claim*

Sector 10 claims on appeal Myers and the Bank interfered with its prospective economic advantage because "Myers fraudulently lured Sector 10 into a stock scam that ultimately deprived Sector 10 of the benefits of the Gage contract, and then obstructed Sector 10's efforts to retrieve the stolen stock sale proceeds." However, Sector 10 did not make this allegation in the operative complaint. Rather, it alleged Myers and the Bank interfered with its prospective contract with the San Francisco Fire Department.[5]

"The pleadings play a key role in a summary judgment motion. ' "The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues" ' and to frame 'the outer measure of materiality in a summary judgment proceeding.' [Citation.]" (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493 (*Hutton*).) "The materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' [Citations.]" (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.) "Accordingly, the burden of a defendant moving for summary judgment only

---

[4] Civil Code section 51 et seq.

[5] Sector 10 apparently chose to abandon this claim on appeal because there was no evidence the San Francisco Fire Department's decision not to pursue Sector 10's proposal had anything to do with the Bank.

11

requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*; that is, a moving party need not refute liability on some theoretical possibility not included in the pleadings." (*Hutton, supra,* 213 Cal.App.4th at p. 493.)

Sector 10 first raised its claim that the Bank interfered with its prospective contract with Gage in its opposition to the Bank's statement of undisputed facts. The Bank's undisputed fact number 26 stated "Myers did not know Sector 10 was pursuing a federal funding contract for SFFD." Sector 10's statement in opposition was "Myers knew of the Gage Consulting-Sector 10 Contract, as he was blind copied on e-mails about the Gage-Sector 10 fully executed contract."

" ' " ' "The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings." ' " [Citation.]' [Citation.] An opposing party's separate statement is not a substitute for amendment of the complaint. [Citation.] Similarly, ' " '[d]eclarations in opposition to a motion for summary judgment "are no substitute for amended pleadings." . . . If the motion for summary judgment presents evidence sufficient to disprove the plaintiff's claims, . . . the plaintiff forfeits an opportunity to amend to state new claims by failing to request it.' " [Citations.]' [Citation.]" (*Hutton*, *supra*, 213 Cal.App.4th at p. 493.)

As in *Hutton*, the Bank "met its burden as the moving party when it negated the sole basis of plaintiff's claims. . . . It was not incumbent on defendant to refute liability on some theoretical possibilities not included in the pleadings. [Citations.] Each of the suggested other grounds for liability argued by plaintiff were simply theoretical possibilities that were not included in the pleadings. Finally, plaintiff cannot use his opposition papers as a substitute for an amended pleading, and his failure to seek an amendment below forfeits the issue." (*Hutton*, *supra*, 213 Cal.App.4th at p. 499, italics omitted.) Thus, summary judgment was properly granted as to this claim.

### Negligent Supervision Claim

Sector 10 also maintains the Bank negligently supervised Myers, resulting in the failure to locate "the stolen $1.14 million" it allegedly lost as a result of the "stock scam."

12

"Negligence liability will be imposed on an employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.' [Citation.] 'California follows the rule set forth in the Restatement Second of Agency section 213, which provides in pertinent part: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . [¶] (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others[.]" [Citation.]' [Citation.] 'Liability for negligent . . . retention of an employee is one of direct liability for negligence, not vicarious liability.' " (*Phillips v. TLC Plumbing, Inc*. (2009) 172 Cal.App.4th 1133, 1139.) "[T]here can be no liability for negligent supervision 'in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised.' " (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 395.)

The negligent supervision claim fails because it is wholly derivative of the claims against Myers. Because we have concluded summary judgment was properly granted as to the fraud, negligent misrepresentation, promissory estoppel and interference with prospective business advantage claims against Myers, there is no basis for a negligent supervision cause of action against the Bank.

### Punitive Damages

Sector 10 finally claims it "has established fact questions warranting a trial of its punitive damages claim," relying on Civil Code section 3294. That section provides in part: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] (b) An employer shall not be liable for [punitive] damages . . . based upon acts of an employee . . . unless the employer had advance notice of the unfitness of the employee and employed him or her with a conscious disregard of the rights and safety of others or

13

authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subds. (a)–(b).)

Punitive damages are a remedy, however, not a cause of action. "Punitive or exemplary damages are remedies available to a party who can plead and prove the facts and circumstances set forth in Civil Code section 3294, the cases interpreting this code section, or by other statutory authority. 'Punitive damages are merely incident to a cause of action, and can never constitute the basis thereof. [Citations.]' [Citation.] 'The concurrence of both an actionable wrong and damages are necessary elements for a cause of action.' " (*Hilliard v. A. H. Robins Co*. (1983) 148 Cal.App.3d 374, 391, fns. omitted.) Thus, Sector 10's claim for punitive damages fails because the trial court correctly determined there is no "actionable wrong."

## DISPOSITION

The judgment is affirmed. Defendants are to recover their costs on appeal.

14

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Margulies, J.